**SECURITIES AND EXCHANGE COM-MISSION, Plaintiff,**

v.

**LOS ANGELES TRUST DEED & MORT-GAGE EXCHANGE, Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Markets, David Farrell, Oliver J. Farrell, Roy A. Bonner, Thomas Wolfe, Jr., and Stanley C. Marks, Defendants.**

Civ. No. 261–58–TC.

United States District Court
S. D. California,
Central Division.

May 4, 1960.

Findings of Fact, Conclusions of Law
and Judgment May 20, 1960.

See, also, 24 F.R.D. 460.

832

Arthur E. Pennekamp, Regional Administrator, F. E. Kennamer, Jr., Chief Enforcement Atty., San Francisco, Cal., Milford A. Maron, Los Angeles, Cal., for Securities and Exchange Commission.

Paul J. Foley, Los Angeles, Cal., for Trust Deed & Mortgage Exchange and David Farrell.

Morgan Cuthbertson, Laguna Beach, Cal., for defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange Markets, Oliver J. Farrell, Roy A. Bonner, Thomas Wolfe, Jr., and Stanley C. Marks.

THURMOND CLARKE, District Judge.

In ruling in this matter, the Court wishes to alert the public to a problem of grave concern to many citizens. This trial has caused many of us to become aware of a serious situation in a very vital part of our economy—the home building industry. We have seen in great detail here the unscrupulous and entirely high-handed manner in which certain speculators mislead countless small investors, and countless other small home buyers, to the mutual detriment of both.

These "10%ers" have developed an ingenious and a thoroughly devious scheme, relying upon what they think to be loopholes in the law regulating those entrusted with investment funds. It is their good fortune that this scheme has not yet come tumbling down around their heads, like the frail cardhouse structure it is, but instead has been arrested by the diligent efforts of the S. E. C. Aside from the unsoundness of the basic plan, this case has unearthed many totally unethical practices on the part of the individuals involved; practices which run a very close line between criminal prosecution and civil actions for fraud.

The Court regrets that the processes of our law have worked so slowly, despite the best efforts of those concerned, and that the hearths of many innocent homeowners and the savings of many innocent investors have been placed in jeopardy.

This is the indicated judgment of the Court; however this is not to be construed as an immediate judgment or order. The judgment of the Court will be entered on the basis of definite findings of fact and conclusions of law. The Commission is directed to lodge such findings of fact, conclusions of law, and proposed judgment by May 11, 1960, at 10:00 a. m.

Final Judgment of Permanent Injunction and Order Appointing Receiver

This action came on for hearing before the Court between October 6, 1959, and May 3, 1960, and the Court having considered all the evidence introduced in the course of the trial on the merits, and the arguments of counsel, and the Court having now entered Findings of Fact and Conclusions of Law to the effect that the evidence sustains the allegations of each Count of the Amended and Supplemental Complaint for Injunction and for Appointment of Receiver, and the Court having found that the Securities and Exchange Commission is entitled to a permanent injunction restraining and enjoining the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Markets, David Farrell, Oliver J. Farrell, Roy A. Bonner, Thomas Wolfe, Jr. and Stanley C. Marks from engaging in acts or practices which constitute or will constitute violations of Section 5(a) and (c) of the Securities Act of 1933, 15

834

U.S.C.A. § 77e(a) and (c), Section 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a), Section 15(c) (1) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o(c) (1), and Rule 17 CFR 240.-15c1–2 thereunder, and Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o(a), as demanded by the Securities and Exchange Commission, and that a receiver should be appointed for the defendants Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, and it appearing that the Court has jurisdiction of the parties hereto and the subject matter hereof—

I

It Is Ordered, Adjudged and Decreed that the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Markets, David Farrell, Oliver J. Farrell, Roy A. Bonner, Thomas Wolfe, Jr. and Stanley C. Marks, their officers, agents, servants, employees, attorneys, assigns, and each of them, and all persons acting in concert or participation with them, be and they hereby are permanently restrained and enjoined from, directly or indirectly—

A) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, namely, evidences of indebtedness, investment contracts or receipts for or guarantees of such securities, issued by the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Markets, or any other securities, including trust deed or mortgage notes or other evidences of indebtedness created, issued or acquired by said defendants in connection with any investment plan, program or arrangement heretofore designated by the defendants as a Secured 10% Earnings Program, Secured 10% Earnings Reinvestment Program or Secured 10% Earnings Accounts, or any similar plan, program or arrangement (hereinafter throughout this decree designated as the Secured 10% Earnings Program), based

upon the sale to members of the investing public of discounted trust deeds or mortgages covering residential or other real estate situated within the State of California or elsewhere, through the use or medium of a prospectus or otherwise; or

B) carrying such securities or causing them to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or for delivery after sale, unless and until a registration statement as to such securities is in effect with the Securities and Exchange Commission; or

C) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities, through the use or medium of a prospectus or otherwise, unless and until a registration statement as to such securities has been filed with the Securities and Exchange Commission, or while a registration statement as to such securities is the subject of a refusal order or stop order issued by the Securities and Exchange Commission, or (prior to the effective date of such registration statement) any public proceeding or examination under Section 8 of the Securities Act of 1933, 15 U.S.C.A. § 77h.

II

It Is Further Ordered, Adjudged and Decreed that the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Markets, David Farrell, Oliver J. Farrell, Roy A. Bonner, Thomas Wolfe, Jr. and Stanley C. Marks, their officers, agents, servants, employees, attorneys, assigns, and each of them, and all persons acting in concert or participation with them, be and they hereby are permanently restrained and enjoined from, directly or indirectly—

A) making use of any means or instruments of transportation or communication in interstate commerce or of the mails, in the offer or sale of the securities described in Section I hereof, to engage in any transaction, practice or course of business which operates or would operate

835

as a fraud or deceit upon the purchasers of such securities, by making through newspaper or other advertisements, radio or television broadcasts, brochures, pamphlets, sales letters or other literature, any incomplete, ambiguous, flamboyant, misleading, deceptive or untrue statement of material fact (by means of statistical data, charts, graphs, comparisons, or otherwise) meaning or intending to imply that the Secured 10% Earnings Program—

a) makes it possible for investors "to enjoy the highest return obtainable with full protection and security offered by Deeds of Trust secured by Real Estate;"

b) affords investors an opportunity "to buy an income for life without reducing [their] principal" through investments in "prime" deeds of trust;

c) allows investors "an income from accumulated savings, earning [them] $100 per month on $12,000, or $50 a month on $6,000, or $25 on $3,000," enabling investors "to build a nest egg for retirement," or "build an estate", with, for example, an investment of $1,000 with $100 added per month for 120 months accumulating to $20,484;

d) assures investors of continuous "10% earnings from [their] savings;"

e) virtually guarantees investors against loss;

or making any untrue or misleading statement to the effect that—

f) Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Markets are the oldest and largest institutions "in the world" or "in America" offering such an investment plan, with "years of experience" in charting the course of investors "to personal security and more enjoyment from life;"

g) Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Markets are "Investment Bankers;"

h) "the only legal difference between a first or second deed of trust is the fact that one was recorded prior to the other;"

i) the "purpose of the 'Exchange' maintained by Los Angeles Trust Deed & Mortgage Exchange, is to provide a clean, ethical market place for or 'exchange' in which the public can buy and sell notes secured by deeds of trust, just as the 'Stock Exchange' does for stocks and bonds," by means of a trading board and facilities similar to those employed by national securities exchanges, or that "just as the stock market has provided a liquid market for shares of stock in American corporations and changed the course of American business so the Trust Deed & Mortgage Exchange was started to provide a liquid market place for notes secured by deeds of trust;"

j) the funds received from investors are "deposited in a separate trust account * * *;"

k) the books and records of Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Markets are "audited monthly by an independent Certified Public Accounting firm which also acts as auditor for savings and loan associations," or any other independent accountant;

l) by continuously reinvesting their "10% Earnings", investors may "build an estate" from $1,000 to $7,328.07 over 20 years, and by adding $100 monthly to their account they should experience a cumulative growth of $75,936.88 over 20 years;

m) no investor has ever sustained a loss or failed to receive a "full 10% earnings;"

n) Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets at all times use their own funds in order to acquire notes secured by deeds of trust for inventory or "warehouse" to be sold to investors, or that the funds of investors are never used to acquire such securities for "warehouse" or inventory;

or any untrue or misleading statement of material fact concerning—

o) the financial condition, liquidity or solvency of Los Angeles Trust Deed &

Mortgage Exchange or Trust Deed & Mortgage Markets;

p) the "liquidation value" or the "estimated liquidation value" of the accounts of investors;

q) the appraised values of the real estate securing trust deed notes;

r) the circumstances under which and the extent to which Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets are subject to or amenable to supervision by any state or federal regulatory agency;

s) the adequacy of any "reserve for losses" or "contingency reserve" or any similar "reserve" established by said corporate defendants;

t) the terms or conditions of any trust deed or mortgage, including its maturity or "anticipated term", any subordination clause or agreement to which such obligation may be subject, or the nature and amount of any prior or subsequent lien applicable thereto;

u) the quality of trust deeds sold to investors or introduced into their accounts, or the underlying equities of the owners of the real estate covered thereby;

v) the use of funds entrusted to the defendants Los Angeles Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Markets, in financing real estate subdivisions in which David Farrell or any other officer or director of said defendants has a direct or indirect "participation" or other interest;

w) the debit balances in investors' accounts;

or any other untrue or misleading statement of similar meaning, object or purport; or

B) in offering for sale or selling such securities, by the means and in the manner described in Section II A, omitting to state any material fact, with reference to such securities necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, concerning—

a) the speculative nature of such investments;

b) the method used in arranging for the monthly reinvestment of investors' funds, or the lack of certainty that monthly collections or additions to investors' accounts can be continuously reinvested in "prime" deeds of trust, in order to establish a capital appreciation measured by "earnings" of 10% compounded monthly over any substantial length of time;

c) the distinctions and differences between first deeds of trust and second deeds of trust;

d) the distinctions and differences between trading in fungible securities listed and registered on national securities exchanges offering auction markets in such securities, subject to regulation and control by such exchanges and by federal and state regulatory agencies, including the Securities and Exchange Commission, and the "open market trading", on an option basis, in notes secured by deeds of trust conducted by defendants through Los Angeles Trust Deed & Mortgage Exchange, or the entire lack of any correlation between them;

e) the losses sustained by investors;

f) the source of funds used by defendants to inventory or "warehouse" notes secured by deeds of trust;

g) the financial condition or solvency of Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Markets;

h) the circumstances under which the Securities and Exchange Commission brought this action in this Court charging all defendants with violations of the registration and anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, and the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets with violations of the broker-dealer registration requirements of the Securities Exchange Act of 1934, the status of such proceedings, or the

findings or rulings of this or any other Court with reference thereto;

i) the background, integrity or qualifications of the officers or directors of or personnel employed by the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Markets, including the fact that C. W. Cannon, former comptroller of Los Angeles Trust Deed & Mortgage Exchange, has been convicted of grand theft and disbarred from the practice of law, and that David Farrell, controlling stockholder and managing officer of Los Angeles Trust Deed & Mortgage Exchange is a former bankrupt;

or the omission of any other material fact of similar object or purport; or

C) in offering for sale or selling such securities, by the means and in the manner described in Section II, soliciting or accepting funds from members of the investing public, through representations that all such funds are deposited in a special trust account and may be withdrawn only after the defendants have selected a note and deed of trust from inventory or "warehouse" for assignment to each investor and said investor has approved and accepted such selection, and that, pending such acceptance, funds so deposited by investors may be withdrawn by them at any time and the purchase authorization to defendants cancelled, when in fact, defendants do not so maintain investors' funds in a special trust account, but on the contrary, said defendants commingle such trust funds with the general funds of the defendants Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, and misappropriate and otherwise misuse funds entrusted to said corporate defendants; or in so soliciting or receiving funds or deposits from investors, omitting or otherwise concealing the fact that the defendants Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets are insolvent or unable to meet their current liabilities, and the further fact that funds received by defendants from investors are constantly endangered and in jeopardy;

or any other untrue or misleading statement of similar meaning, object or purport; or

III

in offering for sale or selling the securities described in Section II, by the means and in the manner stated therein, obtaining money or property by means of any untrue statement of material fact or omission to state any material fact specified in Section II.

IV

It Is Further Ordered, Adjudged and Decreed that the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, as brokers and dealers, their officers, agents, servants, employees, attorneys, assigns, and each of them, and all persons acting in concert or participation with them, be and they hereby are permanently restrained and enjoined from, directly or indirectly—

making use of the mails or of any means or instrumentalities of interstate commerce to effect transactions in, or to induce the purchase or sale of, securities (other than commercial paper, bankers' acceptances, or commercial bills) otherwise than on a national securities exchange, by means of any manipulative, deceptive, or other fraudulent device or contrivance—

a) by engaging in any of the acts or practices specified in Section II; or

b) by representing by the use of the word "Exchange" in the respective corporate designations of the defendants Los Angeles Trust Deed & Mortgage Exchange or Trust Deed & Mortgage Exchange, or in any other way, that either of such defendants is a securities exchange when such defendant is not a securities exchange.

V

It Is Further Ordered, Adjudged and Decreed that the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust

Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, as brokers or dealers (whose business is not exclusively intrastate), their officers, agents, servants, employees, attorneys, assigns, and each of them, and all persons acting in concert or participation with them, be and they hereby are permanently restrained and enjoined from, directly or indirectly—

making use of the mails or of any means or instrumentalities of interstate commerce to effect transactions in, or to induce the purchase or sale of, securities (other than exempted securities or commercial paper, bankers' acceptances or commercial bills) otherwise than on a national securities exchange, unless and until such defendants are registered with the Securities and Exchange Commission, in accordance with Section 15 (b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o(b).

* * * * * *

It Is Further Ordered, Adjudged and Decreed that Pat A. McCormick, of Los Angeles County, California, be and he hereby is appointed receiver of Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, with directions to accomplish the orderly liquidation of Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, subject to his submission of a good and sufficient bond in the amount of $250,000, conditioned upon the faithful performance of his duties as said receiver, and having taken the oath required by law and being otherwise qualified.

It Is Further Ordered, Adjudged and Decreed that said receiver shall take immediate custody, control and possession of all of the funds, property, premises and other assets of or in the possession or under the control of the defendants Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, wheresoever situated, with full power to sue for, collect, receive, and take into possession all goods, chattels, rights, credits, monies, effects, lands, books and records of account, and other

papers and documents of said defendants, and of investors whose accounts have been established with such defendants under defendants' Secured 10% Earnings Program or otherwise, which are now held or under the control of said defendants; to conserve, hold and manage all such assets, pending further order of this Court, in order to prevent irreparable loss, damage and injury to investors, to conserve and prevent the further withdrawal and misapplication of funds entrusted to said defendants; to obtain an accounting thereof; to determine, adjust and protect the equities of thousands of investors whose savings have been entrusted to Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets; and to prevent further violations by defendants, their officers, agents, servants, employees, attorneys and assigns of Section 5(a) and (c) of the Securities Act of 1933, 15 U.S.C.A. § 77e(a) and (c), Section 17(a) of the Securities Act of 1933, 15 U.S.C.A. § 77q(a), Section 15(c) (1) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o(c) (1), and Rule 17 CFR 240.15c 1–2 thereunder, and Section 15 (a) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78o(a), as specified in Sections I, II, III, IV and V hereof.

It Is Further Ordered, Adjudged and Decreed that said receiver be and he hereby is authorized to make such payments and disbursements from the funds so taken into his custody, control and possession or thereafter received by him, and to incur such expenses as may be necessary and advisable in discharging his duties as receiver.

It Is Further Ordered, Adjudged and Decreed that the defendants Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, their officers, agents, managers and employees, be and they hereby are commanded and required to deliver over to said receiver possession and custody of all funds, securities, including trust deeds or mortgage notes, property, premises, and other assets, and all books and records of accounts, title documents, and other papers

of said defendants, and all funds, trust deeds and mortgages, and other assets belonging to investors now held by said defendants under the Secured 10% Earnings Program, or otherwise, and said defendants, their officers, agents, managers and employees, be and they hereby are enjoined and restrained from interfering with said receiver taking such custody, control and possession, and from interfering in any manner, directly or indirectly, with such custody, possession and control by said receiver.

It Is Further Ordered, Adjudged and Decreed that said receiver be and he hereby is authorized to engage and employ competent accountants and appraisers to audit and investigate the books, records and accounts of said defendants Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, and to evaluate the assets of said defendants and to submit suitable reports of such audit, appraisal and evaluation. The appointment of such accountants and appraisers and the nature of their compensation shall be subject to the approval of the Court.

It Is Further Ordered, Adjudged and Decreed that said receiver shall have full power to resist and defend all suits, actions, claims and demands which may now be pending or which may be brought or asserted against the defendants Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets.

It Is Further Ordered, Adjudged and Decreed that said receiver, and any counsel whom the receiver may select, subject to the approval of the Court, shall be entitled to compensation from the assets now held by or in the possession or control of, or which may be received by the defendants Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, in an amount or amounts commensurate with their duties and obligations in the circumstances.

It Is Further Ordered, Adjudged and Decreed that the Court reserves the right to make and enter such further orders or decrees, upon application of said receiver or otherwise, that may be necessary for the guidance of said receiver in his administration of the receivership herein established.

It Is Further Ordered, Adjudged and Decreed that the Court reserves jurisdiction to determine whether Trust Deed & Mortgage Exchange shall be included within the receivership established herein, and, pending report to the Court by the receiver appointed for Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, the defendant Trust Deed & Mortgage Exchange, its officers, agents, attorneys and employees, are hereby ordered and directed to cooperate with and assist said receiver for Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets in his administration of the receivership herein established.

Findings of Fact and Conclusions of Law

I

BACKGROUND STATEMENT

A. Pleadings

1. On March 24, 1958, the Securities and Exchange Commission ("SEC") filed a complaint to enjoin Los Angeles Trust Deed & Mortgage Exchange ("LATD"), Trust Deed & Mortgage Exchange ("TD&ME"), Trust Deed & Mortgage Markets ("TD&MM"), David Farrell, Oliver J. Farrell, Roy A. Bonner and C. W. Cannon[1] from engaging in acts and practices constituting violations of Section 5(a) and (c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.A. § 77e(a) and (c), (Count I); Section 17 (a) of the Securities Act, 15 U.S.C.A. § 77q(a), (Counts II and III); Section 15 (c) (1) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C.A. § 78o(c) (1), and Rule 17 CFR 240.15c1-2 thereunder, (Count IV), and Section 15(a) of the Exchange Act, 15 U.S.C.A. § 78o(a), (Count V).

---

1. On motion of the SEC the action was dismissed as to C. W. Cannon on October 7, 1959.

840

2. The several defendants were charged in Count I of the original complaint with violating Section 5(a) and (c) of the Securities Act, 15 U.S.C.A. § 77e(a) and (c), in offering and selling, through the use and medium of a prospectus and otherwise, certain securities described as "evidences of indebtedness, investment contracts and receipts for and guarantees of such securities, issued by the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, arising out of and in connection with the offering for sale and selling by the defendants of promissory notes secured by deeds of trust covering residential and other real estate situated within the State of California, in accordance with an investment plan and program involving various collateral agreements and undertakings by the defendants Los Angeles Trust Deed & Mortgage Exchange, Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets, designated by the defendants as a 'Secured 10% Earnings Program' and 'Secured 10% Earnings Reinvestment Program,'" and in delivering such unregistered securities after sale.

3. The same defendants were charged in Count II with violating Section 17(a) (3) of the Securities Act, 15 U.S.C.A. § 77q(a) (3), in that in offering and selling the same securities they were engaging in "transactions, practices and a course of business which operates and would operate as a fraud and deceit upon the purchasers of such securities," specifying ten areas of misrepresentation and four areas of concealment of material facts with respect to the investment plan and the securities offered thereunder.

4. The same defendants were charged in Count III with violating Section 17(a) (2) of the Securities Act, 15 U.S.C.A. § 77q(a) (2), in obtaining money and property through the sale of the same securities by means of the untrue and misleading statements specified in Count II.

5. The same defendants were charged in Count IV with violating Section 15(c) (1) of the Exchange Act, 15 U.S.C.A. §

78o(c) (1), and Rule 17 CFR 240.15c1–2, in that they were engaging in "manipulative, deceptive and other fraudulent devices and contrivances," by committing the acts and practices specified in Counts II and III, and, in using in the corporate designations of LATD and TD&ME, the term "Exchange."

6. The defendants were charged in Count V with violating Section 15(a) of the Exchange Act, 15 U.S.C.A. § 78o(a), by engaging in business as brokers and dealers in securities without registration with the SEC, in accordance with Section 15(b) of the Exchange Act, 15 U.S.C.A. § 78o(b).

7. Counts I, II, III, IV and V each contained appropriate allegations that the violations alleged involved the use of the mails and the means and instrumentalities of interstate commerce.

8. The complaint alleged jurisdiction in this Court under Section 22(a) of the Securities Act, 15 U.S.C.A. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.A. § 78aa.

9. On April 9, 1958, the defendants filed an answer denying generally all allegations of the complaint, and setting forth certain affirmative defenses.

10. Pursuant to an order of Court, duly obtained, on October 8, 1958, the SEC filed an amended and supplemental complaint, elaborating upon the misrepresentations of material facts specified in Count II, and alleging for the first time that the corporate defendants were misappropriating funds entrusted to them by investors under the Secured 10% Earnings Program, that the corporate defendants were insolvent and unable to meet their current liabilities, and that funds received by them from "investors . . . have been and are in jeopardy."

11. The amended complaint enlarged the demands made in the original complaint to include a request for the appointment of a receiver for the three corporate defendants. The amended complaint also named Thomas Wolfe, Jr. and Stanley C. Marks as additional defendants.

12. Count II of the amended and supplemental complaint specified fourteen areas in which the defendants have affirmatively misrepresented the Secured 10% Earnings Program: a) that it affords investors an opportunity to buy an income for life without reducing their principal through investments in "prime deeds of trust"; b) that it makes it possible for investors to enjoy the highest return obtainable with full protection and security; c) that through the "Magic of Compound Interest" it constitutes a safe and secure method of achieving rapid capital appreciation up to 632.8% over twenty years as compared with a growth of 81.4% on 3% bank deposits and 121.6% on 4% savings and loan deposits; d) that it enables investors to "build a nest egg for retirement," with $100 a month invested for 20 years at 10% compounded monthly accumulating to $20,484, "if all principal and interest are kept fully working"; e) that it is sponsored and offered by the "oldest and largest" institution offering such an investment plan "with years of experience" in charting the course of investors to "personal security and more enjoyment for life"; f) that it offers a virtual guarantee against loss and a "full, firm return"; g) that the only legal difference between a first and second trust deed is that one is recorded prior to the other; h) that it insures investors continuous 10% earnings on their savings; i) that it is sponsored by an "Exchange" providing a "clean, ethical market place" or Exchange "where trust deed notes may be bought and sold, just as the Stock Exchange does for stocks and bonds," and which provides "just as the stock market does" a liquid market in trust deed notes; j) that it is sponsored by "Investment Bankers"; k) that it constitutes an arrangement under which investors' funds are "deposited in a separate trust account . . ."; l) that its sponsors are audited by an independent certified public accounting firm; m) that no investor has ever sustained a loss or failed to receive a full 10% earnings; n) that the corporate defendants use their own, rather than the funds of investors, to acquire trust deed notes for inventory or "warehouse."

13. Count II of the amended complaint also specified nine areas of concealment and omission of material facts with respect to the Secured 10% Earnings Program: a) the speculative nature of such investments; b) the method used in effecting reinvestments and the lack of certainty that investors' funds can be continuously reinvested in prime deeds of trust; c) the legal distinctions between first and second deeds of trust; d) the distinctions between trading in fungible securities listed on regulated national securities exchanges and the defendants' "open market trading" in trust deed notes; e) the losses sustained by investors; f) the sources of funds used to inventory or "warehouse" trust deed notes; g) the financial condition of the corporate defendants; h) the legal action brought by the SEC; i) the background, integrity and qualifications of officers and personnel of the corporate defendants.

B. Preliminary Proceedings

1. The SEC, on October 8, 1958, filed a motion for a preliminary injunction and for the appointment of a receiver. On October 14, 1958, the defendants filed a motion for immediate trial, and the Court tentatively set the action for trial on the merits on December 9, 1958. By agreement, the hearing on the motion of the SEC was begun on October 17, 1958, and continued intermittently, as the calendar of the Court permitted, until November 7, 1958, when the Court granted the motion of the SEC. The defendants immediately filed notice of appeal.

2. The order of the Court entering a preliminary injunction and appointing a receiver was stayed first on November 10, 1958, by the Honorable Stanley N. Barnes, Judge of the United States Court of Appeals for the Ninth Circuit, pending a hearing before that Court on the motion of the defendants for a stay. On November 13, 1958, the Court of Appeals granted a further interim stay, and on November 17, 1958, entered an order

staying the preliminary injunction and order appointing a receiver until its further order. The stay order specially assigned the appeal for hearing on the merits on January 23, 1959, and shortened the time for the filing of briefs. The stay order, like the two earlier interim stay orders, included an order restraining the defendants from withdrawing funds or assets, including trust funds, of the corporate defendants, except in the regular and ordinary course of business.

3. On February 17, 1959, the Court of Appeals reversed the order of this Court granting the motion of the SEC for a preliminary injunction and for the appointment of a receiver and remanded the matter for trial on the merits on the issues presented. 264 F.2d 199. The restraining order theretofore entered by the Court of Appeals was continued in effect.

4. Following disposition of a number of discovery motions, including a motion of the SEC, which the Court granted, for an order under Rule 37(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., for the imposition of sanctions against the defendants LATD and David Farrell, including the striking of the answer as to those defendants and taking as established, as to them, of certain facts claimed by the SEC, because of the contumacy of the two defendants in refusing to comply with an order of the Court granting the SEC access to certain books and records of LATD, the trial of this action was begun on October 6, 1959. Two days later, on October 8, 1959, the defendants, pursuant to leave duly granted, applied to the Court of Appeals for writs of prohibition and mandamus prohibiting this Judge from exercising any further jurisdiction in this litigation, commanding him to vacate his earlier order, entered after the remand from the Court of Appeals, striking affidavits of bias and prejudice filed by the defendants David Farrell and Oliver J. Farrell, and commanding him to vacate his order under Rule 37(b). At the same time, the defendants filed notice of appeal to the Court of Appeals and a motion to stay further proceedings in this Court. Further proceedings before this Court were suspended pending action of the Court of Appeals.

5. This Judge filed a return with the Court of Appeals to the petition for writs of prohibition and mandamus, and designated counsel for the SEC to appear for him in opposition to the petition. On October 16, 1959, the Court of Appeals denied the motion to stay proceedings in this Court, denied the petition for a writ of prohibition and mandamus and dismissed, *sua sponte*, the "purported appeal" from the order of this Court under Rule 37(b), as being interlocutory and not constituting a final decision under 28 U.S.C.A. § 1291 or § 1292.

6. On October 23, 1959, this Court, on defendants' motion, vacated its order under Rule 37(b). The considerations which impelled the Court to vacate the order are fully set forth in an opinion reported in 24 F.R.D. 460. After carefully weighing all the evidence received in the course of this lengthy trial, the Court is convinced of the soundness of the course which, as set forth in the opinion vacating the order under Rule 37(b), the Court felt compelled to follow, notwithstanding the contumacious conduct of LATD and David Farrell.

7. The trial on the issues before the Court was resumed on October 27, 1959. The trial consumed thirty-seven trial days. The trial transcript runs to 3,581 pages, exclusive of lengthy hearings on pre-trial motions. A total of 175 exhibits were introduced on behalf of the SEC, while the defendants introduced a total of 45 exhibits. It is on the basis of this extensive record that the Court enters the following findings of fact and conclusions of law.

## II

### THE DEFENDANTS

A. Los Angeles Trust Deed & Mortgage Exchange

1. LATD is a corporation organized under the laws of the State of California on January 28, 1955, with an authorized

capital of $500,000, represented by 500,-000 shares of common stock, $1 par value, of which 100,000 shares (including 50,-000 promotion shares issued to the defendant David Farrell) are issued and outstanding. David Farrell, President and Chairman of the Board, owns 77,400 of the 100,000 shares. Thomas Wolfe, Jr., who holds 1,050 shares, is the only other stockholder defendant.

2. Oliver J. Farrell, Thomas Wolfe, Jr., and Stanley C. Marks are, respectively, Vice-President and Secretary-Treasurer and Director, Assistant to the President, and Comptroller of LATD. Roy A. Bonner was a Vice-President and Comptroller of LATD until May, 1958, when he resigned.

B. Trust Deed & Mortgage Exchange

1. TD&ME, also a California corporation, all of whose stock is held by David Farrell, is "national coordinator" of defendants' Secured 10% Earnings Program, a plan based upon the sale to investors of discounted, negotiable promissory notes secured by second deeds of trust, or first deeds of trust subject to subordination to construction loans, covering real estate situated within the State of California.

2. TD&ME and LATD have the same officers and directors. TD&ME as "national coordinator" does not sell trust deed notes directly to the public, but grants franchises to subsidiaries and affiliates to offer the investment plan to members of the public. At the present time the only "franchised affiliates" are LATD, TD&MM, a wholly owned subsidiary of LATD, and Colorado Trust Deed & Mortgage Markets, all of whose stock is owned by David Farrell.

3. TD&ME receives 10% of the gross profits realized by its "franchised af-filiates" from the sale of trust deed notes to members of the public for its services as "national coordinator" of the investment plan. All advertising of the program is done under the sig-cut or insignia of TD&ME.

4. TD&ME and LATD maintain executive and sales offices in Los Angeles, California, and have established sales offices in San Francisco, Oakland, San Diego, Santa Barbara, Pasadena and Beverly Hills, California, and Denver, Colorado.

C. Trust Deed & Mortgage Markets

1. TD&MM is a California corporation, none of whose stock has been issued. If and when the stock of TD&MM is issued, it will become a wholly owned subsidiary of LATD. At this time, TD&MM is merely a department of LATD.

2. Until August, 1959, TD&MM was a mere corporate shell having neither assets nor liabilities.[2]

3. In August, 1959, LATD "spun off" its out-of-state accounts to TD&MM, and since that time, except in Colorado, the offering of the Secured 10% Earnings Program outside of California has been carried out in the name of TD&MM.

### III

### THE SECURED 10% EARNINGS PROGRAM

A. Introduction

1. From the outset of this litigation, the defendants have sought refuge in semantics. By deleting the words "program" and "plan" from their more current brochures and advertisements, they have sought to avoid classification of the instruments issued to investors as "investment contracts" within the definition of "securities" in Section 2(1) of the

2. The Secured 10% Earnings Program was advertised in the name of TD&ME in Los Angeles metropolitan newspapers from about December, 1957, until about January, 1958, after members of SEC's staff in Los Angeles had warned David Farrell and counsel for LATD and TD&ME that the corporate titles of LATD and TD&ME are misleading in that the use of the word "Exchange", in the corporate designations, implies, con-trary to fact, that LATD and TD&ME are securities exchanges furnishing facilities for the purchase and sale of trust deed notes comparable to the facilities available for trading in securities listed and registered on national securities exchanges. The defendants soon disregarded the warning and resumed advertising the Secured 10% Earnings Program under the sig-cut of TD&ME.

Securities Act, 15 U.S.C.A. § 77b(1), and Section 3(a) (10) of the Exchange Act, 15 U.S.C.A. § 78c(a) (10). Similarly, the current brochure contains the naive caveat, describing the "Purchase Authorization" under which investors entrust their funds to LATD, *"It is not an investment contract binding you to any definite length of time or any specific monthly amount"*.

2. The current brochure even sedulously avoids the innocent word "account." The managing officers of the corporate defendants have testified, with singular unanimity, that neither LATD nor TD&ME, the "national coordinator" of the Secured 10% Earnings Program, has any meaningful or integrated investment "program" or "plan," and does not so represent to the investing public. They have even denied, with equal unanimity, under oath, that LATD establishes and maintains "accounts" for the 8,000 or more investors who have entrusted their funds to LATD, insisting that LATD does not establish "accounts" for investors, but merely accepts purchase authorizations from "customers," and that each of the many thousands of investors has devised and is carrying out his own individual investment plan. These contentions would be merely ludicrous if it were not for the fact that, in testifying, the defendant officers repeatedly fenced with counsel for the SEC and evaded answering categorical questions for the sole reason that the questions, unavoidably, included the word "program," "plan," "investors" or "accounts." [3] They thereby delayed and interfered with the progress of the trial.

3. The defendants' investment plan is referred to hereinafter as the Secured 10% Earnings Program.

4. It is absolutely clear, and the Court so finds, that nothing in the record, except the unwarranted assertions of counsel for the defendants, suggest that the SEC is attempting to control or regulate the entire mortgage loan industry, or to extend its jurisdiction beyond applicable statutory limitations. On the contrary, the evidence establishes that the SEC seeks only to test the character of the instruments evidencing the Secured 10% Earnings Program, a new and distinctive method of securing public financing of real estate subdivisions, by "the terms of the offer, the plan of distribution, and the economic inducements held out to the [investors]," and to measure the defendants' offering to the public by "what [it is] represented to be." The quoted language is from S. E. C. v. C. M. Joiner Leasing Corporation, 1943, 320 U.S. 344, 352, 353, 64 S.Ct. 120, 124, 88 L.Ed. 88.

B. Essential Elements of the Program

1. The Secured 10% Earnings Program is made up of two interdependent and integrated elements. The first element of the investment plan, as described by the defendants in brochures, other selling literature and through newspaper, magazine, radio and television advertising, involves the offer and sale to members of the public of notes secured by deeds of trust covering residential and other real estate situated within the State of California. The deeds of trust securing the notes are either second deeds of trust subject to a first deed of trust, or first deeds of trust containing a subordination clause under which they are to be subordinated and become subject to obligations resulting from construction loans.[4]

2. Under the Secured 10% Earnings Program, LATD sells a trust deed note to the investor at a price which the defendants represent to the investor will "earn" 10% per annum on the amount invested, based upon the interest rate stated in the note, the discount allowed the investor from the unpaid principal balance of the note, and the "anticipated term" of the note. A substantial num-

---

3. This observation does not apply to the defendant Thomas Wolfe, Jr., Assistant to the President of LATD, who merely identified certain advertising material.

4. LATD acquires and sells under the Secured 10% Earnings Program a small number of true first trust deed notes. The sale of such notes is of no significance in relation to LATD's total volume of business.

ber of the trust deed notes sold by LATD do not contain a fixed maturity date, but merely establish the principal sum due, the rate of interest, and the amount to be paid monthly, and provide that monthly installments shall continue until the entire obligation is satisfied. These are known as "until paid notes" and are identified on the confirmations sent by LATD to investors by the symbol "TP."

3. LATD arbitrarily establishes within a framework of "anticipated term" such variables as the amount to be paid monthly, the principal amount due, and the interest rate, in calculating the discount to be allowed the investor in order that the amount invested will "yield" or "earn" 10% in accordance with its "earnings" formula. Nothing in the brochures, sales literature or other advertising contains any definition or explanation of the significance of the arbitrarily assumed "anticipated term" in the computation of yield, nor is the investor advised of the actual maturity of trust deed notes running until paid.[5]

4. A substantial number of other trust deed notes sold under the Secured 10% Earnings Program are similar to the notes running "until paid," but carry a definite maturity date, with the result that, at maturity, a large percentage of the principal amount becomes due and payable. This final sum is known as a terminal or "balloon" installment. When a note of this nature matures, the maker or trustor is required to liquidate the entire principal amount due or arrange for refinancing of the obligation, in order to avoid foreclosure.

5. A substantial number of the trust deed notes sold under the Secured 10% Earnings Program are known as "interest only" obligations. By the terms of such notes, the stated rate of interest is payable monthly or quarterly, with the entire principal amount due and payable at a stated maturity date.[6]

6. A lesser number of the trust deed notes sold to investors by LATD are conventional notes, carrying a specified interest rate, to be amortized over a stated period of time.

7. Nothing in the brochures, other sales literature or advertising used by LATD or TD&ME contains any explanation or definition of "until paid," "interest only" or "balloon" notes.

8. Sometime after receipt of an investor's funds and a purchase authorization signed by him, LATD selects and confirms to the investor a trust deed note. The investor receives no information from LATD with respect to the trust deed note selected for and confirmed to him, except the abbreviated description given in the confirmation, unless he insists upon receiving a more specific description of the instrument and the underlying security. LATD does not furnish the investor an appraisal of the real estate or the equity securing the trust deed note. The investor is not consult-

---

5. These instruments are specially illusory from the point of view of the average investor. For example, one investor received a trust deed note running "until paid", after instructing the salesman that he wanted a short term investment only. He discovered later that the full principal amount would not be paid for some twenty-two years. Not only the investor is at a loss to understand the esoteric formula used by LATD in computing the price of trust deed notes sold to "earn" 10% under the Secured 10% Earnings Program. The defendant Stanley C. Marks, LATD's Comptroller, testified (Tr. p. 660) that he understood "anticipated term" to mean the maturity date of the obligation.

6. As shown by the records of LATD (PX 160), a note secured by Trust Deed 8421 in the original amount of $4,495, bearing interest from March 1, 1959, at 7% per annum ($26.22 monthly), with the entire principal amount due October 15, 1962, was introduced into the account of an investor on June 1, 1959. By the terms of the note, only $24 is to be paid monthly, or $2.22 less than the monthly interest, without taking into account the increase in the balance due which will result from interest accruals in the event only $24 per month is paid as specified in the note. The amount of the first trust lien had increased from an original amount of $10,000 to $10,201.89 at the time the trust deed was introduced into the account of the investor.

ed, in advance of the sending of the confirmation, with respect to the nature and quality of the trust deed note to be selected for his account. As stated in the current brochure describing the Secured 10% Earnings Program, the defendants represent that investors may depend upon the "careful screening and appraising by [LATD's] Purchasing Department," in order to minimize the risk incident to investing under the Secured 10% Earnings Program, and that "all Trust Deeds which we purchase for resale to our customers are carefully checked by our Title Department, and full advantage is taken of the protection provided by the California Civil Code. We are proud indeed of our record to date in handling Secured 10% Earnings Trust Deeds: None Of Our Customers Has Ever Sustained A Loss, Nor Has Any Customer Who Has Held A Trust Deed For At Least Six Months Failed To Receive His Full 10% Earnings."

9. Although under the Secured 10% Earnings Program the investor may, if he chooses, buy a trust deed note outright and make his own collections of monthly or other periodic installments from the maker or trustor, the defendants recognize that it is not feasible for investors throughout the United States and in foreign countries to so service the trust deed notes which they purchase from LATD. Accordingly, the investor is encouraged to authorize LATD to service the note, without cost to the investor, by making installment collections, sending out necessary delinquency notices and, if necessary, effecting foreclosure in event of default.[7] When LATD makes such monthly or other periodic collections, the sums received are remitted to the investor, or, at the option of the investor, applied by LATD to the purchase of a new trust deed note under the Secured 10% Earnings Program.

10. The second basic element of the Secured 10% Earnings Program involves the purchase of trust deed notes on "installment terms." Under this plan, trust deed notes are sold to investors on an installment basis. The investor may remit a sum of money to LATD for the purchase of a trust deed note on an installment basis, with title to be retained by LATD until the entire purchase price is paid. The difference between the purchase price of the note and the amount paid in by the investor is established as a debit balance on the books of LATD, and any additions to the account made by the investor and collections received by LATD from the trustor are credited

---

7. A reprint of an article from the National Real Estate and Building Journal (PX 146) which was widely circulated by the defendants describes TD&ME as "America's first open market place for the purchase and trading of trust deeds," and its services in establishing trust deed portfolios from which investors "receive a continuing 10%." The article continues with the statement, "Comparatively few people, however, and almost no small investors, [have] the requisite knowledge properly to evaluate trust deeds, to prepare the necessary legal papers attendant upon their purchase, and *service the trust deeds through to their maturity. These are specialized services, for. the ·performance of which the Trust Deed & Mortgage Exchange is staffed with specialists.* (Emphasis supplied.) The article then defines the "unique" service offered by LATD in arranging for investors to "receive the earnings from his account monthly as income," or "leaving these earnings to be added to his account" to be "automatically * * * applied to the purchase of an additional trust deed" thereby "earning a continuous 10%". [The investment program is not automatic in any sense. This is obviously so for the reason that in order to maintain continuous 10% "earnings" on the original investment rather than on the declining balance of the note, monthly installments must be received promptly and kept continuously reinvested.] The article then describes the "restless mind" of David Farrell as evolving the idea that with the "discounts offered on trust deeds being traded on his 'big board' and with the excellent record of trust deeds' behaviour [sic] there was an *average* percent profit that could be packaged and sold." The article continues with a description of the "warehousing" of trust deeds by LATD at cash discounts, and the sale of "selected" trust deeds "meeting strict standards" at discount prices designed to earn 10% annually.

toward the purchase price of the trust deed note, with LATD carrying the debit balance and applying collections from the trustor and any additions to the account by the investor until the debit balance is liquidated. When the debit balance in the investor's account is extinguished, he is entitled to have the trust deed note transferred to him.

11. While the account of the investor remains in debit balance, LATD retains title to the trust deed. Some 85% of the thousands of accounts on the books of LATD are in debit balance. This means that 85% of the investors are making monthly deposits with LATD, or having LATD apply collections on trust deed notes, which they own in full, to the purchase of a new trust deed note, or both, and that not more than 15% of investors are receiving monthly remittances from LATD. It is also a reasonable assumption from the evidence, although not made explicit in the record, that many investors whose accounts are not in debit balance allow their funds to remain on deposit with LATD. Thus, LATD, at all times controls millions of dollars of investors' funds.

12. The reinvestment or "growth" plan is described in the basic brochure (p. 4) currently in use by LATD and TD &ME in the following terms:

"You Can Build An Estate

"The following tables show the growth of $1000.00 and $100.00 per month over specific years if earnings at 10% per annum are reinvested monthly. Now take a pencil and multiply (or divide) by your surplus money and by the amount you can afford to add monthly. You will be amazed to compare the results with the earnings you are now receiving.

| The amount to which $1000.00 will grow over various periods at 10% if earnings are reinvested monthly | Number of years | Cumulative growth of $100.00 added per month | |
|---|---|---|---|
| $1,104.71 | 1 | $ 1,256.55 | |
| 1,220.39 | 2 | 2,644.69 | |
| 1,348.18 | 3 | 4,178.18 | |
| 1,645.31 | 5 | 7,743.70 | |
| Your → 2,007.92 | 7 | 12,095.04 | ← This could |
| money doubles 2,707.04 | 10 | 20,484.50 | earn $100 per |
| every 7 years. 4,453.92 | 15 | 41,447.03 | month for you. |
| 7,328.07 | 20 | 75,936.88 | |

"The printing of this schedule is for information only and should not be construed as a guarantee or representation that any customer's funds will actually grow to the projected total. No bank or savings institution can guarantee that their present rate of interest, dividends or earnings will be continued as many economic factors which cannot be accurately predicted affect growth and interest. Generally speaking, factors adversely affecting our business and trust deed ownership would exist only if the general economic climate changed so as to produce (a) large scale foreclosures on residential properties; or (b) a large scale drop in values of improved real estate. Another possibility is that we could not accommodate additional customers if a rise in price to par,

or a figure close thereto, precluded the obtaining of sufficient qualified trust deeds at a discount which could be resold to yield 10%. Obviously, the continuity of 10% earnings for many years in the future, through a series of trust deeds yet to be purchased, must be predicated upon the assumption of present economic conditions prevailing. Qualified by the foregoing, however, we know of no reason why the above figures should not materialize just as they are set forth."

The foregoing excerpt from the current basic brochure corresponds to similar representations made in the first basic brochure issued in December, 1957, and the first revised brochure issued in July, 1958, except that in the two earlier brochures the "growth" tables were extended to 30 years showing $1,000 growing to $19,837.39, if invested at 10% compounded monthly, and a cumulative investment of $100 per month growing to $226,048.79. The first basic brochure contained no caveat following the "growth" tables. The first revised brochure contained the following caveat:

"The printing of this schedule is for information only and should not be construed as a guarantee or representation that any account holder's funds will actually grow to the projected total. No bank or savings institution can guarantee that their present rate of interest will be continued as many economic factors which cannot be accurately predicted affect growth and interest."

C.  Discounts to LATD and Mark-ups to Investors

1.  The discount formula used by LATD in acquiring a group of second trust deed notes for sale to investors under the Secured 10% Earnings Program is evidenced by a letter agreement dated November 1, 1957, under which LATD agreed to purchase from Riverside Builders, Inc. 43 second trust deed notes in the face amount of $2,400 each, bearing interest at 7%, to be "created" as the homes then under construction were sold.

By the terms of the letter agreement, LATD was to purchase the trust deed notes at 60% of face value (a discount of 40%) where the notes were to be payable at the rate of 1% per month and have a maturity of five years, at 58% of face value (a discount of 42%) where the maturity was to be seven years, and at 55% of face value (a discount of 45%) where the notes were to run "until paid." The letter agreement noted that it would be necessary for LATD to "earmark enough money to go through with our commitment."

2.  The evidence establishes that more recently LATD has acquired trust deed notes for sale to investors under the Secured 10% Earnings Program at average discounts of about 25% to 30% from face value, and sells such trust deed notes to investors at an average gross mark-up over cost of about 25%.

3.  The trust deed notes are sold to investors at a price discounted to yield 10% per annum, taking into consideration the face amount of the note, the rate of interest, the amount of monthly payment, and the maturity date. LATD advertises that funds deposited by the twentieth of the month earn 10% from the first. In instances where the investor's funds have remained uninvested for some time, LATD introduces the trust deed note into the account at a price which will reflect "earnings" of 10% from the date the investor's funds were received.

D.  Instruments Evidencing Investments Under the Program

1.  The investor under the Secured 10% Earnings Program whose account is not in debit balance receives from LATD an assignment, without recourse, of the trust deed note, an assignment of the trust deed, a policy of title insurance, an engraved Certificate of Registration and Ownership, certifying that his trust deed has been registered in his name (or in the name of LATD as Trustee) on the records of LATD. The Certificate of Registration and Ownership, which is designed to resemble an engraved share of stock or bond, and which bears the "great

seal" of a "member of Trust Deed & Mortgage Exchange," gives the trust deed number as registered on the books of LATD, the name of the registered owner, the description of the lot or unit of land securing the trust deed, the face amount, unpaid balance and terms of the note.

2. While all investors receive a "Certificate of Registration and Ownership" they are encouraged to leave title to their trust deeds in the name of LATD as Trustee. This, of course, gives LATD full dominion over their accounts. Some 30% or 40% of investors who hold fully paid for trust deeds have acquiesced in this arrangement. LATD retains title to all trust deeds sold on installment terms.

## IV

## METHODS OF ACQUIRING TRUST DEED NOTES

A. Second Trust Deed Notes

1. LATD purchases second trust deed notes in substantial volume from subdividers and developers of residential real estate subdivisions (tracts), at discounts ranging above 40% of the principal balances due on the trust deed notes. LATD enters into firm commitments with real estate subdividers to purchase second trust deed notes covering entire tracts. These · commitments by LATD are evidenced by letter and other more formal agreements, and are confirmed by LATD to the vendor or supplier by a separate "Buy Order." The buy order sets forth the tract and lot number, a brief description of the dwelling to be completed on the lot, the net purchase price to be paid by LATD, the number assigned to the trust deed by LATD, the face amount of the note, the unpaid balance, the balance due, the amount to be paid monthly, rate of interest and maturity date. The buy order also describes the first lien against the specific lot.

2. Such arrangements commit LATD to. purchase second trust deed notes covering entire tracts, in advance of the actual construction of the homes, and in advance of the actual creation of the trust deed notes following construction and sale of the houses, and requires LATD to apply the uninvested funds entrusted to it by investors under the Secured 10% Earnings Program in fulfilling its commitments to real estate subdividers.

B. Subordinated First Trust Deed Notes

1. LATD purchases at substantial discounts and in large volume, for resale to investors under the Secured 10% Earnings Program, *first* trust deed notes which are executed by tract subdividers and developers and accepted by the owners of the land being subdivided in full or partial satisfaction of the purchase price of the land. These trust deed notes are known as subordinated notes since they contain a clause under which the subdivider may obtain a construction loan from a conventional lending institution, such as a bank, savings and loan association or insurance company, and upon the recording of the trust deed securing the construction loan the *first* trust deed accepted by the landowner is automatically subordinated to the construction loan and becomes a second trust deed.

2. ' The arrangement under which LATD purchases subordinated first trust deeds is made contemporaneously with the execution of the trust deed notes by the tract subdivider, with the result that the landowner is assured of receiving the discounted price of the trust deed notes as agreed upon between the landowner, the subdivider and LATD.

3. LATD purchases such subordinated trust deed notes in advance of any construction, and in advance of the actual creation of the subdivision, and, at times, in advance of the filing of the subdivision map and notice of intention with the Real Estate Commissioner under Section 11010 of the Business and Professions Code of the State of California, which is required to obtain a Subdivision Public Report, in accordance with Section 11018 of the Code.

4. The funds entrusted to LATD by investors under the Secured 10% Earnings Program are applied by LATD to

the purchase of such highly speculative subordinated trust deed notes for inventory or "warehousing" and resale to investors.

■ 5. The evidence establishes that while investors are led to believe that LATD brings into inventory under the Secured 10% Earnings Program only "seasoned," "prime," "trouble-free" trust deeds which have been carefully "screened" and "appraised" by experts, and that such trust deeds are secured by substantial underlying equities representing the investments of homeowners, the true facts are that many thousands of trust deeds which have been introduced into the accounts of investors under the Secured 10% Earnings Program cover units of raw, vacant and unimproved land, and are subject to subordination to construction loans of indeterminable amounts. It is a reasonable, if indeed, not a necessary inference from the evidence, and the Court finds that for many months substantially all of the trust deeds acquired by LATD under the Secured 10% Earnings Program fall within this category.

C. Quality of Trust Deeds and Lack of Appraisals

1. The basic brochure issued by LATD and TD&ME described the quality of trust deed notes selected by LATD for the Secured 10% Earnings Program as follows:

"Because We Are The Oldest And Largest *institution of this type in America, all types of notes secured by trust deeds are offered to us in tremendous volume.* These notes all go over a "screening desk." The very best of these notes are then carefully processed to determine the value of the property; whether the owner has a large cash equity; if his credit and job are stable * * *."

The basic brochure also contained the following similar representations:

"* * * You will note that we do not act as your agent but as principal, first purchasing these notes *with our own funds* after careful screening and investigation. You can thus be sure that we investigate thoroughly. (Emphasis supplied.)

"* * * How Safe Are Trust Deed Investments?

"We invest your funds in notes secured by what we consider to be the world's best security * * * the American home * * * Such notes, secured by trust deeds against individual homes sold by property owners who receive a substantial down payment, are exactly the type which we purchase and sell to you under this program. We consider them to be among the most secure and trouble free investments on the face of the earth * * * The history of California trust deed investments is so good that it borders on the unbelievable * * *

"* * * We maintain a standard we consider to be unequalled in the business world for selection and control of the notes selected and sold to each investor. Our policies are backed by substantial capital placed in our operation by ourselves * * *."

2. The first revised brochure in July, 1958, contained the following, among other, representations with respect to the screening and selection of trust deed notes for the Secured 10% Earnings Program:

"* * * we do not purchase or resell such low equity [i. e., resales of 100% G.I. financed homes] trust deeds to Secured 10% accounts, it is obvious that the foreclosures among the "prime" trust deeds are small indeed.

"* * * Such trust deeds [where the buyer of the home has a substantial equity] are the type which we purchase and sell to you. We consider them among the most secure and trouble free investments."

3. The current brochure contains the following similar representation under the heading Standards and Policies:

"Regardless of position, each trust deed purchased by the company for subsequent resale to any customer is carefully screened, the property appraised, and the following standards usually observed:

" * A first trust deed cannot normally exceed 80% of what our appraisers determine to be the fair resale value of the property.

" * A second trust deed must (except in unusual cases) be subordinate only to a 'conventional' bank, savings and loan, or insurance company first trust deed, having a normal rate of interest (from 5% to 7½%) and the total of the two trust deeds, both first and second, cannot under most circumstances exceed 85% of the resale value of the property as determined by our appraisers.

"* The second trust deeds we buy do not normally exceed ⅓ of the conventional first trust deed. (Conventional first trust deed loans do not normally exceed 60% of the appraised value of the property.)

"It should be obvious that there are many factors that go into determining the qualifications of each trust deed. If the property owners have made substantial improvements since purchasing the property or should neighborhood or other values accelerate because of development and demand, these factors are taken into consideration. In the opinion of our staff any selection which has passed on the check points and standards for subsequent resale to a customer, is calculated to be 'trouble free.'

"No Secured 10% Earnings Customer has ever sustained a loss! "

4. LATD has not and does not conform to the standards represented to investors in connection with the screening and appraising of trust deed notes for the Secured 10% Earnings Program. On the contrary, LATD has used and is using funds entrusted to it by investors to finance commitments made to developers of highly speculative real estate subdivisions, involving the creation and sale to LATD of subordinated first trust deed notes and second trust deed notes, in advance of actual construction and sale of the residences securing such obligations, and without benefit of appraisals by qualified real estate appraisers, either at the time the trust deed notes are created or at the time they are sold to investors under the Secured 10% Earnings Program.

5. The SEC has scheduled 88 representative trust deeds introduced into the accounts of investors by LATD to determine whether or to what extent LATD observes the 85% ratio set forth in the current offering brochure. The following table, condensed from the five schedules (PX 96–100), shows that in only one instance was the standard met, and that in the remaining 87 instances the maximum was exceeded by from 8 to 33 percentage points:

Percentage Ratios of Balances Due
on
Combination of First and Second Trust
Deed Notes
to
Valuation Appraisals

| Number of Trust Deed Notes | Percentage Ratios |
|---|---|
| 1 | 84 |
| 7 | 93 |
| 16 | 94 |
| 5 | 95 |
| 1 | 96 |
| 2 | 98 |
| 2 | 102 |
| 29 | 104 |
| 18 | 107 |
| 1 | 108 |
| 1 | 109 |
| 2 | 110 |
| 1 | 112 |
| 1 | 115 |
| 1 | 118 |
| Total 88 | |

6. The appraisal valuations used by SEC were those of qualified appraisers for the savings and loan associations holding the first trust deeds. The evidence establishes that in this, and nearly all similar situations, LATD had made no independent appraisals, or that the defendants could not or would not produce them even in response to *subpoenas duces tecum*. The Court finds from the evidence that the representation that LATD selects and brings trust deeds into inventory only after expert screening and appraising is untrue. Such screening and appraising has been the exception rather than the rule.

## V

### COMMINGLING AND MISAPPLICATION OF FUNDS ENTRUSTED TO LOS ANGELES TRUST DEED & MORTGAGE EXCHANGE

1. From about December, 1957, and continuing at least as late as May, 1958, LATD distributed, through the mails and otherwise, at least 20,000 copies of its first basic brochure describing the Secured 10% Earnings Program. This brochure contained the following explicit representations with respect to the segregation of funds entrusted to LATD by investors and the circumstances under which trust deed notes were selected by LATD for investors:

"Your Money is Protected Through Our Bonded Status. Upon receipt your money is deposited in a separate trust account for customers' money and a receipt forwarded to you together with a receipt book for the purpose of recording additions or withdrawals from your account. While your funds are in our possession and under our control, our fidelity bonds covering each employee for one hundred thousand dollars assure you of constant protection and even cover negligence, omissions, errors and misplacement. After careful analysis of your particular needs, our Selection Committee determines which notes in warehouse will most properly build the type of program you desire. Emphasis is placed on protection and diversification."

2. Similar representations were made in a registration statement which, on January 3, 1958, LATD attempted to file with the SEC under the Securities Act covering the Secured 10% Earnings Program:

"Under the program as proposed an investor desiring to use the services of the Company would forward to the company a sum of money and authorize it to be used for the purchase of notes secured by deeds of trust or mortgages at a price which when the discount, interest and term are considered would yield 10%. *These funds are placed in the separate account and are not commingled with the company's funds where they remain until the authorized persons of the company make proper sale to the investor's account of the specific note which they best feel fits the investor's desires and portfolio.* (Emphasis supplied.)"

The registration statement was signed by David Farrell, President, Oliver J. Farrell, Secretary-Treasurer, and Roy A. Bonner, Vice-President. The registration statement was not accepted by the SEC for filing, and was returned to LATD with a letter from SEC's staff dated January 8, 1958, stating that the registration statement did not meet the requirements of the Securities Act or Regulation C thereunder (17 CFR 230.-400 et seq.), in that, among other things, it was not accompained by the required filing fee, the accompanying prospectus did not contain the required financial information, and the financial statements submitted were not in accordance with Regulation S-X, SEC's accounting regulation (17 CFR 210 et seq.).

3. When LATD began the Secured 10% Earnings Program, a special trust account was established to accommodate and safeguard investors' funds. On February 11, 1958, by resolution of

LATD's Board of Directors, the designation of the trust account was changed to "Customers' Purchases Account." At about the same time, the form of receipt issued to investors entrusting funds to LATD for investment was modified by deleting the word "trust." For some months before revising the trust receipt form, and without any revision of the basic brochure describing the Secured 10% Earnings Program, LATD had commingled trust funds with its general funds. As soon as the investment program began to assume substantial dimensions and the volume of sales of trust deed notes under the Secured 10% Earnings Program reached substantial volume, LATD abandoned the fiction of segregating investors' funds in a special trust account and thereafter commingled such funds with its general funds and have since used them indiscriminately for general corporate purposes, including, contrary to express representations made to earlier investors, the inventorying or "warehousing" of trust deed notes, and the financing of debit balances of investors under the "reinvestment program."

4. The basic brochure in use at least until May, 1958, contained the following statement: "Upon approval by our screening committee, we pay for the note with our own funds and place it in what we call a "warehouse" account until such time as it either seasons or fits properly into the portfolio of a particular investor * * * The 'marginal' or what we consider to be highly speculative type deeds are listed on our 'Big Trading Board' and offered for sale to professional buyers or speculators * * * We *reemphasize that such investments are not selected or sold to [investors]*, for we consider them to be of a highly speculative nature." The same basic representation was made in the first revised brochure issued in July, 1958: "Our Profit Is Obtained In Two Ways:"

"1. By buying large quantities of trust deeds at a cash discount from builders, brokers, escrow companies, developers, and other individuals who handle real estate transactions. These sellers are willing to sell their trust deeds at a discount because they need to keep their funds available for their business. We buy only what we consider to be safe trust deeds, and hold them in our 'warehouse' account. We then resell these trust deeds to our customers at a discount to yield them a full 10% return. The differential in the discount is our profit.

"2. From our 'board trading' activities, whereby we negotiate the sale or underwriting of blocks of trust deeds or individual trust deeds which are not qualified for our Secured 10% Earnings Accounts."

5. At the time LATD attempted to file its registration statement covering the Secured 10% Earnings Program with SEC, the representation that investors' funds were segregated and held in a separate account until invested was absolutely untrue.[8]

6. Although until about September, 1959, LATD was licensed as a real estate broker in accordance with the Business and Professions Code of the State of California, since at least as early as December 1, 1957, it has not maintained funds entrusted to it by investors under the Secured 10% Earnings Program in a neutral escrow depository or in a trust fund account as required by Title 10, California Administrative Code, Article 15, Section 2830:

"2830. When Trust Fund Account Is to Be Maintained. Set-Up of Account. Every person, partnership or corporation holding a broker license under provisions of the Real Estate Law who does not immediately place all funds entrusted to him

8. The filing of a registration statement including any untrue statement of or omitting any material fact is a criminal offense under Section 24 of the Securities Act, 15 U.S.C.A. § 77x.

by his principal or others in a neutral escrow depository or in the hands of principals, shall maintain a trust fund account with some bank ·or recognized depository and place all such entrusted funds therein upon receipt."

On the contrary, since at least as early as December 9, 1957, all funds received by LATD under the Secured 10% Earnings Program have been and are being commingled with other funds received by LATD, including monthly collections made by LATD for investors holding note secured by deeds of trust which LATD is servicing under the Secured 10% Earnings Program, and for which funds it is accountable as a fiduciary.

## VI

### "OPEN MARKET" TRADING BY LOS ANGELES TRUST DEED & MORTGAGE EXCHANGE

1. The basic brochure used by LATD and TD&ME in connection with the Secured 10% Earnings Program contained the representation that " * * * our founder and president, David Farrell, is the originator of 'open market trading' in deeds of trust. Just as the stock market has provided a liquid market place for shares of stock in American corporations and changed the course of American business, so the Trust Deed & Mortgage Exchange was started to provide a liquid market place for notes secured by deeds of trust." The brochure also contained the representation that LATD "effects a 'stablization policy' relative to such notes and purchases for our own account at prices above those normal in the market * * * "

The first revised brochure credits David Farrell with "creating an entirely new industry when he originated 'big board' and 'open market' trading in trust deed investments. Realizing that there were more trust deeds and mortgages in existence (in dollars) than stocks and bonds, and no public market place, he foresaw the extreme value to the investor of providing just such an exchange." Each such brochure includes a photograph of an impressive "big board" where trust deed notes are stated to be listed for "open market" trading by LATD.

2. The current brochure contains the following nearly identical representation:

FACTS YOU SHOULD KNOW ABOUT

| TRUST DEED |
| ——— & ——— |
| MORTGAGE |
| EXCHANGE |

Not a National Securities Exchange

———◆———

Trust Deed & Mortgage Exchange has been in business since 1954. David Farrell, President, is credited with creating an entirely new industry when he originated "big board" and "open market" trading in trust deed investments. Realizing that there were more trust deeds and mortgages in existence (in dollars) than stocks and bonds, and no public market place, he foresaw the extreme value to the investor of providing just such an exchange. After several years of ground work and experimentation with accounting and bookkeeping practices, Secured 10% Earnings Trust Deeds were then made available to our customers.

The brochure also contains elaborate photographs of "America's first open market trading board for the purchase and trading of trust deeds * * * "

3. From the inception of the Secured 10% Earnings Program, "open market trading" by LATD has consisted solely in obtaining options on notes secured by deeds of trust of the most speculative variety and attempting to sell such notes in *negotiated* transactions at prices above the option prices. The "open market" trading by LATD in trust deed notes has no connection with the Secured 10% Earnings Program, and such "big board" trading has not been and is not intended to "stabilize" prices in trust deed notes for the benefit of investors under the Secured 10% Earnings Program. The "open market" or "big board" trading conducted by LATD is entirely dissimilar to trading in conventional securities such as stocks and bonds on national securities exchanges offering true *auction* markets in securities listed and registered thereon, and which have established memberships subject to rules and regulations of such exchanges and to regulation by the SEC. The purported "Exchange" maintained by LATD has no members, and LATD has adopted no rules or regulations governing trading in such instruments. Since the inception of the Secured 10% Earnings Program, "open market" trading by LATD in trust deed notes on an option basis has been inconsequential, and LATD has received only minimal revenue therefrom. The "big board" has been and is being maintained merely as a sham and façade to lead investors to believe that LATD "stabilizes" prices of trust deed notes above normal market levels, and that trust deed notes acquired under the Secured 10% Earnings Program may be liquidated at any time without risk of loss.

4. The following excerpt from the testimony of David Farrell (Tr. pp. 2400, 2401), relegates the "big board" to its true position *vis à vis* the Secured 10% Earnings Program:

"Q. Now, Mr. Farrell, what is the relevance or what is the correlation between the stabilization policy of Los Angeles Trust Deed & Mortgage Exchange, as expressed in its several advertising brochures and the Secured 10 Per Cent Earnings accounts—just what connection is there between those two situations?

"A. There has been no stabilization policy or language expressed in any of the literature of the company for the past two years, Mr. Kennamer.

"Q. Well, now, Mr. Farrell, just what connection is there between the big board trading as depicted in the several advertising brochures, including the blue brochure, the most current one, and the Secured 10 Per Cent Earnings accounts?

"A. There is no connection whatsoever that I know. We do not have what you have characterized to be 10 Per Cent Earnings accounts. We have purchase orders from our customers. But there is no connection between the big board upon which the trust deeds which are not sold to such customers are offered, and the Secured 10 Per Cent customers themselves."

## VII

## FINANCIAL STATUS AND INSOLVENCY OF LOS ANGELES TRUST DEED & MORTGAGE EXCHANGE

A. Lack of Liquidity

1. The basic brochure currently being used by the defendants contains the following representations with respect to "liquidity" of LATD and the circumstances under which investors may liquidate trust deed notes acquired under the Secured 10% Earnings Program:

"Liquidity

"We are not in the banking, savings and loan, or securities business, however, we endeavor to maintain a financial liquidity (cash to total liabilities) higher than most of the banks, savings and loan associations and security brokers."

This representation appears in the brochure immediately below the familiar slogan—

"No Secured 10% Earnings Customer has ever sustained a loss!"

2. This representation is made in the current brochure in connection with the further representation that should an investor "desire to liquidate a trust deed to obtain cash, all that is usually necessary is for [the investor] to assign [his] trust deed to another [investor] pursuant to arrangements which [LATD] may make, or to reassign it to [LATD] for [LATD's] 'warehouse' account * * * Under present conditions [LATD] can normally liquidate a trust deed within a day or so. However, if [an investor has] many trust deeds it may require from several days to a week's time to liquidate them. This service is rendered on a best efforts basis.

[LATD MAKES] No Charges Or Penalties For The Whole Or Partial Liquidation Of [An Investor's] Trust Deeds: However, the price obtainable in the open market for trust deeds held less than six months is such that the customer should not expect 10% earnings if liquidated before that time."

3. The length of time that the investor holds the trust deed obviously has no effect on the market value of the trust deed, except to the extent that market value is enhanced by seasoning and the building up of an underlying equity, an element conspicuously absent from the substantial majority of trust deeds which, as the record establishes, LATD brings into inventory and immediately introduces into the accounts of investors. Nor is the artful language quoted consistent in the least with the calculated and successful efforts of the defendants in conditioning the minds of investors through mass application of all the least desirable advertising techniques to accept and rely upon assurances that—

"Remember * * * accounts opened by the 20th * * * or additions received by the 20th * * * earn from the 1st!"

and, as expressed through all forms of advertising media, that investors' portfolios of trust deed notes are fully liquid and may be readily converted into cash.

4. This and similar statements appearing in earlier brochures are untrue. Rule 17 CFR 240.15c3–1 (the "net capital rule"), promulgated by the SEC under Section 15(c) (3) of the Exchange Act, 15 U.S.C.A. § 78o(c) (3), requires brokers and dealers in securities to maintain a ratio of "aggregate indebtedness" to "net capital" not exceeding 2,000 per centum, or, stated in different terms, the Rule requires that to assure liquidity the assets of a broker or dealer, conservatively valued and after certain deductions, exceed his liabilities by an amount equal to 5% of his "aggregate indebtedness" as defined in the Rule.[9] The "net capital rule" tests both financial strength and liquidity. Accordingly, in computing "net capital", as defined in the Rule, all fixed assets and other assets not readily convertible into cash are eliminated and securities held in inventory by the broker or dealer are written down by specified percentages.

5. The following table gives in condensed form the ratio of aggregate indebtedness to net capital of LATD as at sixteen months between December 31, 1957, and September 25, 1959.

---

9. As a simple example, a new broker-dealer with a single customer who has deposited $100,000 in cash with the broker-dealer, would be required to have another 5% of $100,000, or a total of $105,000 in cash or other liquid assets, assuming that the broker-dealer had *no other liabilities*.

Los Angeles Trust Deed & Mortgage Exchange
Net Capital and Aggregate Indebtedness

## Rule 17 CFR 240.15c3-1

| Date | Aggregate Indebtedness | Required Capital | Adjusted Net Capital (Deficit) | | | | Excess Capital or Additional Capital Required [1] | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Before Inventory Deduction | After 30% Deduction | After 20% Deduction | After 10% Deduction | After 30% Deduction | After 20% Deduction | After 10% Deduction |
| December 31, 1957 | $ 198,093.26 | $ 9,904.66 | $ 59,753.56 | $ 32,735.88 | $ 41,741.78 | $ 50,747.67 | $ 22,831.22 | $ 31,837.12 | $ 40,843.01 |
| February 28, 1958 | 416,612.57 | 20,830.62 | 43,415.86 | (7,571.53) | 9,424.27 | 26,420.07 | 28,402.15 | 11,406.35 | 5,559.45 |
| March 31, 1958 | 300,204.43 | 15,010.22 | 76,708.69 | 60,779.17 | 66,089.01 | 71,398.85 | 45,768.95 | 51,078.79 | 56,388.63 |
| April 30, 1958 | 503,442.29 | 25,172.11 | 48,478.43 | 7,054.58 | 20,862.53 | 34,670.48 | 18,117.63 | 4,809.58 | 9,498.37 |
| May 31, 1958 | 558,848.16 | 27,942.40 | 62,497.20 | 20,017.49 | 34,177.39 | 48,337.30 | 7,924.91 | 6,234.99 | 20,394.90 |
| June 30, 1958 | 780,843.99 | 39,042.19 | 40,157.78 | (82,450.81) | (41,581.28) | (711.75) | 121,493.00 | 80,623.47 | 39,753.94 |
| July 31, 1958 | 1,228,979.29 | 61,448.96 | (3,166.91) | (62,018.93) | (42,401.59) | (22,784.25) | 123,467.89 | 108,850.55 | 84,233.21 |
| August 31, 1958 | 1,402,426.54 | 70,121.32 | (127,120.93) | (186,951.87) | (167,008.22) | (147,064.57) | 257,073.19 | 237,129.54 | 217,185.89 |
| September 30, 1958 | 1,509,067.25 | 75,453.36 | 21,026.93 | (66,508.01) | (37,329.70) | (8,151.88) | 141,961.37 | 112,783.06 | 83,604.74 |
| February 28, 1959 | 2,880,810.84 | 144,040.54 | 54,127.56 | (235,748.71) | (139,123.29) | (42,497.86) | 379,789.25 | 283,163.83 | 186,538.40 |
| May 31, 1959 | 4,016,442.81 | 200,822.14 | (246,624.14) | (679,765.87) | (535,385.29) | (391,004.71) | 880,588.01 | 736,207.43 | 691,826.85 |
| June 1, 1959 | 3,578,081.79 | 178,949.08 | (27,636.84) | (341,844.64) | (287,108.71) | (182,372.77) | 520,793.72 | 416,057.79 | 311,321.85 |
| June 30, 1959 | 3,636,635.51 | 181,831.77 | (101,483.71) | (607,608.30) | (438,900.10) | (270,191.90) | 789,440.07 | 620,731.87 | 452,023.67 |
| July 31, 1959 | 6,513,615.87 | 325,680.79 | 45,311.04 | (1,009,750.55) | (658,063.35) | (306,376.15) | 1,335,431.34 | 983,744.14 | 632,056.94 |
| August 31, 1959 | 5,793,656.16 | 289,682.80 | 120,716.95 | (512,925.94) | (301,711.64) | (90,497.34) | 802,608.74 | 591,394.44 | 380,180.14 |
| September 25, 1959 | 4,792,246.96 | 239,612.34 | (90,517.52) | (301,874.69) | (281,422.30) | (100,989.91) | 641,487.03 | 471,084.64 | 400,582.25 |

1. Figures in italics represent additional capital required under Rule 17 CFR 240.15c3-1.

6. The foregoing and detailed underlying computations were made by two of the SEC's expert accountants,[10] each of whom has examined and analyzed thousands of statements of financial condition of brokers and dealers registered under the Exchange Act and whose qualifications as experts are not open to question.

7. It is more than clear that the SEC's experts have established the essential falsity of LATD's assertion of financial liquidity and that the representation quoted from the current brochure is materially and intentionally misleading.

8. Rule 17 CFR 240.15c3–1 requires the deduction of a percentage of the market value of securities included among assets as a cushion against downward fluctuations in market value. The specified deduction in the case of all securities, other than non-convertible debt securities and cumulative, non-convertible preferred stock, is 30%. This is the deduction which the SEC's experts believe should be applied against LATD's inventory at all times.

9. David Farrell admitted, in the course of his testimony (Tr. p. 2055), that LATD brings trust deed notes into inventory at discounts averaging from 22% to 27%. Other evidence in the record indicates that the discounts average 30% and perhaps more.[11] The Rule provides for a lesser deduction in the case of the two special types of securities.

10. The defendants contend that the lesser deduction applied to certain non-convertible debt securities is applicable to LATD's inventory trust deed notes. The SEC's experts, while rejecting such contention, have also computed the amount of additional capital required if only a 20% or a 10% deduction is used. Even the most generous treatment results in capital deficiencies in substantial amounts for each of eleven scheduled periods from June 30, 1958 through September 25, 1959. Indeed, the computations show that the adjusted net capital *before any inventory deduction* was in deficit at least six times since June 30, 1958, including September 25, 1959, the most recent date as of which a statement was available.

11. While, ordinarily, LATD purchases trust deed notes for inventory at average discounts of not less than 25% to 30% and resells such securities to investors at average mark-ups over cost of about 25% when it repurchases trust deed notes from investors (whether because of an intervening default or delinquency or simply because the investor wishes to liquidate), such repurchases are made at the higher cost to the investors (less any principal sums received by them), and are retained in inventory by LATD *at the higher* repurchase price until resold or otherwise liquidated. The SEC's experts made no deduction for the overstatement of inventory resulting from such repurchases, as to any of the 16 dates included in the foregoing table. Any such deduction would have increased the amount of the capital deficiency shown.

12. In determining LATD's "net capital" under the Rule, the debit balances in accounts of investors purchasing trust

---

10. R. W. Rheinschild, Supervisory Securities Investigator, Los Angeles Branch Office of the SEC, and Wallace B. Dunlap, a Certified Public Accountant, formerly Research Accountant, Office of the Chief Accountant, and now Financial Accountant, San Francisco Regional Office of the SEC.

11. The trust deed notes necessarily fall within either subsection (c) (2) (C) (i) or (c) (2) (C) (iii) of the adjustments required by the definition of the term "net capital." In the latter event, a 30% deduction is required; if they fall within (c) (2) (C) (i), a 30% deduction is required where the *market value* is more than 30% below the face value. The computations have been based upon cost of the trust deed notes to LATD as market value, for the reason that, in the absence of an established market for securities, contemporaneous cost is the best measure of market value. There is no established market for trust deed notes in the sense that markets exist for more conventional securities.

deed notes under the Secured 10% Earnings Program on an installment basis were accepted by SEC's experts at face value as stated in the balance sheets, despite the fact that they do not represent currently enforceable obligations of the investors which LATD might realize upon in the event of financial emergency. On the contrary, such investors are not contractually obligated to continue their installment purchases. In accordance with the terms of the purchase authorizations and LATD's established policy, each such investor may cancel his purchase authorization and recover the amount of his investment from LATD.[12]

13. The defendants' contention that the deposits made with LATD by investors under the Secured 10% Earnings Program, which are recorded as credit balances and shown as current liabilities on LATD's financial statements, should be eliminated from LATD's "aggregate indebtedness," as defined in Rule 17 CF R 240.15c3-1, as constituting "open contractual commitments" within sub-paragraph (c) (1) (H) of the Rule, is an absurdity. As the Commission's accounting experts testified, the term "contractual commitments", as understood in the securities business and defined in the Rule, includes such commitments as underwritings, when-issued, when distributed and delayed delivery contracts, but certainly does not include such items of indebtedness as investors' credit balances. Moreover, the purchase authorization under which investors in the Secured 10% Earnings Program deposit their funds with LATD does not establish a contractual arrangement until at least five days after LATD has selected and confirmed out a trust deed note to the investor.

14. The defendants themselves introduced in evidence an interdepartmental memorandum bearing the signature of David Farrell (DX F Tr. p. 822) dated May 29, 1959, which demonstrates beyond question that the defendants at all times have understood deposits by investors under the Secured 10% Earnings Program to constitute "free credit balances" and not "open contractual commitments" as they were captioned on the misleading financial statements as at June 1, 1959, and September 25, 1959, certified by Robert F. Jordan. The first two paragraphs of the memorandum follow:

"As you realize, it has been the policy of the company in the past to accept funds from a customer for the purchase of trust deeds, and prior to actual assignment and ownership of a trust deed by a customer, to make an advance of the projected

---

12. The defendants Stanley C. Marks and David Farrell have asserted before the Court that the debit balance accounts of investors who are purchasing trust deed notes on installment terms represent "demand obligations," and that LATD may, at any time, demand that such investors liquidate their debit balances. This extraordinary assertion is contrary to all the evidence, and is controverted by their own testimony and the testimony of the defendant O. J. Farrell to the effect that trust deeds are introduced into the accounts of investors only under circumstances where, ordinarily, they will be liquidated through installment deposits and the application of monthly collections within one year. Nothing whatever within the terms of the purchase authorizations would warrant classification of investors' debit balances as demand receivables. The LATD so considers them (or so represents to the Court) is most revealing in the light of the fact that admittedly none of the 8,000 investors under the Secured 10% Earnings Plan has been informed by LATD that his debit balance is subject to call at any time.

The testimony of Stanley C. Marks and David Farrell to the effect that the management of LATD considers the debit balances in investors' accounts to constitute demand obligations and therefore regards them as immediately convertible in cash, is diametrically opposed to the following statement appearing in italics in the current brochure describing the nature of the purchase authorization and obligations undertaken by investors:

It is not an investment contract binding you to any definite length of time or any specific monthly amount.

earnings, so that the customer could receive a check on the first of the month, after he had made his funds available.

"In view of the fact that this might possibly be construed as a payment of interest, instead of a mere advance against future earnings, which is charged against the *free credit balance* of the customer, it shall be the policy of the company to forward earnings checks to each customer only after a trust deed has been confirmed to the customer, and not rejected." (Emphasis supplied.)

According to the testimony of Stanley C. Marks (Tr. p. 3305), the caption "Customer's Open Contractual Commitments" was devised by David Farrell rather than Robert F. Jordan, the certifying accountant. The classification of investors' free credit balances as "open contractual commitments" is further, although merely cumulative evidence of the subservience of the certifying accountant to the wishes of management, even to the extent of intentionally mislabeling a highly important segment of LATD's balance sheet.

15. The defendants also contend that the SEC's experts improperly computed LATD's capital deficiency under the net capital rule, but do not attempt to suggest an alternative calculation. Stanley C. Marks, LATD's Comptroller, testified, in substance, that the trust deed notes held in inventory by LATD are as readily marketable as shares of United States Steel Corporation, despite the fact that he admitted that he knew of no established auction market in second trust deed notes in the sense that a stock exchange provides such a market in listed securities (Tr. pp. 3338, 3339). Within this and many other areas his testimony skirted a thin line between evasiveness and untruthfulness.

B. The Reserve for Losses

1. On January 14, 1958, the Board of Directors of LATD adopted a resolution establishing a "contingency reserve" of 3% of total purchases of trust deeds, and made provision for adding to the reserve as at March 31, 1958 (fiscal year-end), "any costs incurred in repurchasing trust deeds as of that date." As stated in the resolution, the "contingency reserve" was established *"in view of [LATD's] policy to repurchase delinquent trust deeds which have been sold to secured 10% earnings account holders, and in view of the additional expense and losses which will certainly be incurred through this policy."* [Emphasis supplied.] The formula adopted by LATD in establishing the "contingency reserve" on the basis of 3% of the cost to LATD of the trust deed notes purchased for resale to investors has been inadequate at all times to provide a reasonable reserve for losses incident to carrying out LATD's stated policy of repurchasing delinquent trust deed notes, in view of the highly speculative and unseasoned quality of the securities sold to investors under the Secured 10% Earnings Program, and the current policy of LATD to commit funds entrusted to it by investors to speculative subordinated trust deed notes.

2. The "contingency reserve" established on January 14, 1958, did not provide a reserve to accommodate the substantial costs which LATD would necessarily incur in servicing the growing number of accounts established under the Secured 10% Earnings Program by making monthly collections, attempting to cure defaults and delinquencies and, if necessary, carrying out foreclosure proceedings, in accordance with LATD's commitments and undertakings to investors.

3. Although the trust deed notes sold to investors under the Secured 10% Earnings Program are described in LATD's basic brochures, other sales literature and through other advertising media as "prime" and "trouble-free," the facts are that such trust deed notes are highly speculative, and numerous defaults, delinquencies and foreclosures have occurred and are continuing to occur on an increasing scale, and LATD

has received and is continuing to receive an increasing number of demands to repurchase trust deed notes which are in default or to substitute current notes for those in default.

4. On March 31, 1959, the directors of LATD reviewed the formula which had been established in January, 1958, for a "contingency reserve," or reserve for losses, and adopted a resolution adding to the reserve the sum of $119,378 to "absorb any losses which might be incurred in the future," in connection with its policy to repurchase delinquent trust deeds from investors. This reserve was equal to 1¼% of total sales to investors during the preceding fiscal year. Although the resolution contained a recital that it was based upon a "careful analysis of the data and statistics pertaining to losses charged against the special reserve" by Stanley C. Marks, LATD's Comptroller, and "current policy and future anticipated conditions," Marks admitted, in the course of his testimony, that he made no written report with respect to the reserve for losses to the directors of LATD. His attempted explanation of the circumstances under which the new and lower reserve was established is completely meaningless, in the light of the increasing number of delinquent trust deeds which LATD was then finding it necessary to repurchase from investors.

C. Insolvency of Los Angeles Trust Deed & Mortgage Exchange

1. From the inception of the Secured 10% Earnings Program, LATD has been grossly undercapitalized, and has been dependent upon the flow of cash from new investors, or additions to existing investors' accounts, in order to meet its commitments for the purchase of trust deed notes for inventory or "warehouse," to carry the substantial debit balances established in "installment purchase" accounts, to meet its obligations to account to investors for monthly collections on trust deed notes which it has undertaken to service, and to meet its general operating and other expenses.

2. Throughout the Secured 10% Earnings Program, it has been necessary for LATD to apply the funds belonging to investors, for which it is accountable as a fiduciary, in order to meet one or more of its other current obligations. Since at least as early as December 1, 1957, LATD has managed to survive only through the continuous and indiscriminate commingling, diversion and misapplication of funds entrusted to it by investors under the Secured 10% Earnings Program.

3. The entire 100,000 shares of the capital stock of LATD issued and outstanding represent an investment of only $50,000 in cash. The remainder was issued to David Farrell for "promotion." As at February 28, 1958, for example, all capital and reserves and current debt of LATD, exclusive of investors' trust accounts, totaling about $329,375, equaled only about $194,000, while inventory and investors' debit balances equaled about $428,000. This inversion of capital and reserves and current debt to inventory and advances to investors has necessarily resulted in the continued commingling and diversion of trust funds, in contravention of LATD's fiduciary obligations to investors. Throughout the Secured 10% Earnings Program, LATD has so jeopardized the funds entrusted to it by investors.

4. The liquidity and solvency of LATD has depended at all times in substantial measure upon the value and marketability of its inventory of trust deed notes. LATD's inventory has included, at all times, delinquent and defaulted trust deed notes repurchased from investors at their cost (generally 25% higher than LATD's original cost). These delinquent trust deed notes are carried by LATD in inventory, without segregation, at the higher cost, which necessarily results in an overstatement of the inventory account. As at September 25, 1959, these defaulted obligations represented 57% of inventory.

5. The two accounting experts for the SEC, who made the foregoing computations of net capital and aggregate

indebtedness of LATD, have made a careful analysis of the financial condition of LATD as at March 31, 1959, and determined that on that date LATD was insolvent in a bankruptcy sense to the extent of $176,100. This determination was reached upon the basis of financial statements of LATD filed with its federal income tax return for the fiscal year ended March 31, 1959, an independent examination of the accounts of LATD as at that date, and three basic and necessary adjustments of the balance sheet. The insolvency of LATD, as determined by the SEC's accounting experts, and the nature of the adjustments made in the balance sheet, appear in an adjusted balance sheet as at March 31, 1959 (PX 168). As set forth in the explanatory notes to the adjusted balance sheet, the first adjustment corrects certain erroneous entries made on LATD's books of account; the second makes certain additional entries required by generally accepted accounting principles; and the third removes from the balance sheet an asset of no realizable value.

6. The first adjustment removes from the accounts of LATD the overstatement of value in the inventory of trust deed notes which resulted from LATD's method of recording repurchases from its investors of delinquent and defaulted trust deed notes and those rejected by investors. The following hypothetical example of the method by which such repurchases are recorded on the books and included in the inventory account is taken from the testimony of Stanley C. Marks, LATD's Comptroller (Tr. p. 3324): LATD purchases a trust deed note for inventory at an original cost of $600; the trust deed note is introduced into the account of an investor at a price to the investor of $1,100; shortly thereafter LATD repurchases the same trust deed note from the investor for $1,100; the repurchased note is then recorded on the books of account and valued in inventory at $1,100 rather than at the original cost to LATD of $600. This obviously results in an overstatement of inventory in the amount of $500. Ed-

win Russ, the certified public accountant who testified as LATD's accounting expert, admitted the correctness of the generally accepted accounting principle that repurchased merchandise should be recorded at an amount not in excess of original cost (Tr. p. 3257). He then, however, made the baseless assertion that the admitted principle does not apply to repurchases of trust deed notes by LATD from its investors since they comprise "arm's length" transactions (Tr. p. 3263). It is evident, of course, that each such repurchase from an investor is merely the final element in a series of related transactions, and that in no sense may LATD be considered as dealing at arm's length with an investor. The legal premise of Mr. Russ' assertion is, of course, outside the scope of his expertise.

7. The reason for recording repurchased merchandise or trust deed notes at not more than original cost is evident. In the example given, the fact that the note had been held briefly in the account of the investor did not increase its value, and after repurchase LATD was in no better position than when the note was originally acquired from the trustor. This is even more evident in those situations where LATD repurchases delinquent and defaulted trust deeds from investors. The excess of the repurchase price over original cost represents a profit made by LATD at the time the trust deed note is introduced into the account of an investor. That profit is lost upon repurchase, and in accordance with generally accepted accounting principles should be eliminated from the accounts.

8. The total amount of such lost profit applicable to repurchases (with the exception of $14,571 which was covered by the second adjustment made in the balance sheet) was $77,755. Accordingly, the first adjustment reduced LATD's earned surplus by $77,755 and correspondingly reduced the value of inventory stated at cost.

9. The second adjustment reverses the entries made on the books of account in connection with the arrangement un-

der which LATD on January 14, 1959, acquired from Goheen Construction Co. 800 trust deed notes, each in the amount of $788.46, or an aggregate of $630,768, at a gross cost to LATD of $591.35 per note, or an aggregate of $473,076, as described in Section XII. The 800 trust deed notes were introduced into the accounts of investors by LATD prior to March 31, 1959, at their face value of $788.46 each, resulting in a profit to LATD of $157,688.

10. On February 9, 1959, the Commissioner of Corporations of the State of California issued a Desist and Refrain Order prohibiting the further sale or negotiation of the 800 trust deed notes as being in violation of the California Corporate Securities Law. Subsequently, the entire transaction was rescinded pursuant to a "Rescission Agreement" dated June 22, 1959, between Goheen Construction Co. and LATD, and the trust deed notes were withdrawn from the accounts of investors and brought into inventory. Thereafter all 800 trust deed notes were reconveyed to Goheen Construction Co. by LATD at its original cost. The second adjustment removes from net capital the profit of $157,688, which was lost by LATD as a result of the rescission.

11. Generally accepted accounting principles require that recognition be given in a financial statement to certain types of events occurring subsequent to the date of the financial statement, if they are known, or reasonably ascertainable, at the time of preparation of the statement.

12. The record clearly shows that LATD was aware, prior to March 31, 1959, of the fact that the entire arrangement under which the 800 trust deed notes were introduced into the accounts of investors would have to be rescinded. Upon receipt of the Desist and Refrain Order, LATD should have made provision in its accounts for the eventual reversal of the transaction. The second adjustment is merely a belated accomplishment of that which LATD should have done.

13. The third adjustment made by SEC's experts removes from the accounts the asset "deferred promotion expense" in the amount of $50,000. The $50,000 represents the aggregate par value of 50,000 shares of LATD's capital stock, $1 par value, which were issued to David Farrell for his services as promoter. Since such services have no realizable value, and would provide no relief for creditors, in the event of insolvency, they were written off by SEC's experts against earned surplus.

14. The defendants' expert questioned the validity of this adjustment on the basis that the accounting records of a business reflect the going concern value (Tr. p. 3239). He admitted, however, that in a test of solvency the asset in question, deferred promotion expense, would have no liquidating value (Tr. p. 3285).

15. It should also be noted that LATD itself deducted the asset "deferred promotion expense" from the capital section in the condensed balance sheet as at September 25, 1959, which it published for the information of investors (PX 41).

16. The defendants contend that a further adjustment should have been made in the balance sheet as at March 31, 1959, which would have resulted in a decrease in the capital deficiency established by the SEC's experts. The balance sheet, filed with LATD's federal income tax return (PX 167), and the adjusted balance sheet (PX 168), reflect a "reserve for repurchases" in the amount of $141,001.72 as a deduction from "Inventory Trust Deeds." The defendants contend that this is actually a surplus reserve, rather than a valuation reserve, and should have been reported as part of capital, instead of as a deduction from inventory.

17. A surplus reserve is a segregation of surplus. It can be established and increased only by a charge to surplus, never by a charge to income. It is reported on the balance sheet as part of the capital

section, never as a deduction from assets. Finally, a surplus reserve of the type the defendants refer to is "to provide a reserve for possible losses of so uncertain and contingent a nature that the creation of a reserve by charge to income would not be justified." [13] The record shows that the "reserve for repurchases" does not meet any of these essential tests.

18. Credits to the reserve were offset by charges to income which are reflected in LATD's income statements for the fiscal year ended March 31, 1958 (PX 1), and March 31, 1959 (PX 167). The reserve was reported as a deduction from the asset "Inventory—Trust Deeds" in balance sheets prepared by LATD's accountants as at March 31, 1958, and March 31, 1959 (PX 167), May 30, 1959 (PX 9), June 30, 1959 (PX 10), July 31, 1959 (PX 12), and August 31, 1959 (PX 13). Finally, the reserve was not created to provide for losses of an uncertain and contingent nature. The minutes of LATD's directors dated January 14, 1958 (PX 15), authorizing establishment of the reserve, state that it is to provide for "additional expense and losses which will certainly be incurred through this policy" (of repurchasing delinquent trust deeds).

19. Mr. Russ, defendants' expert, testified that the reserve was a surplus reserve (Tr. p. 3237). However, on cross-examination, he made the following admissions which completely negate such contention:

(1) He had not been shown the minutes of the board of directors dated January 14, 1958 (PX 15), referred to above, but only a later minute dated March 31, 1959 (PX 16), which does not contain the quoted language (Tr. pp. 3267–3269).

(2) It would be entirely inconsistent with generally accepted accounting principles to establish a surplus reserve by a charge to income (Tr. p. 3270).

20. The record of LATD of issuing checks against insufficient funds also points to a highly unstable financial condition. From January, 1958, through June, 1958, LATD drew 72 checks totaling $46,841, varying in amount from $2 to $15,000, on the Security First National Bank, which were dishonored as having been drawn against insufficient funds. The bank also dishonored 17 other checks as having been drawn against uncollected funds. The defendants Stanley C. Marks, the Comptroller, and David Farrell, in testifying, dismissed these irregularities as occurring because of delays in the transfer of funds to LATD's payroll account. The Court cannot accept this explanation. While some of the dishonored checks were payable to officers or employees of LATD, the list included the following:

| Amount of Check | Payee |
| --- | --- |
| $ 2,840 | Gardena Escrow Company |
| 1,342 | San Diego Escrow Co. |
| 250 | Pacific Telephone & Telegraph Co. |
| 15,000 | Ken Bern Construction Co. |
| 500 | Morgan Cuthbertson |

During the same period of time other checks drawn by LATD on three different banks were also dishonored because drawn against insufficient funds.

21. It is true, of course, that as the flow of cash from investors to LATD (which has been generated and nurtured by LATD's massive use of misleading

13. Principles of Accounting (Introductory) 5th ed., Finney & Miller 1957, p. 202.

advertising) increased, LATD's cash position was ameliorated, even to the point where it began to and still does maintain very large bank balances composed of funds deposited with LATD by investors. *These large balances, however, are a sign not of strength but of the basic fallacy of the Secured 10% Earnings Program, as they evidence the inability of LATD to obtain trust deed notes even of the low quality which the evidence establishes have been and are now being introduced into the accounts of investors, in sufficient quantity to assure continuous "earnings of 10%" compounded monthly.*

22. The evidence establishes, and the Court finds, that LATD was insolvent in a bankruptcy sense as at March 31, 1959, and that it is a reasonable assumption from the evidence that such insolvency is a continuing condition.

D. The "Window-Dressing" of LATD's Financial Statements

1. The financial statement of LATD as at June 1, 1959, certified by Robert F. Jordan (PX 11), reflects "Deposits for Purchase of Trust Deeds" in the amount of $1,129,472. The statement as at September 25, 1959, also certified by Robert F. Jordan (PX 42), shows "Deposits for Purchase of Trust Deeds" in the amount of $965,276. These items represent deposits by LATD with title and escrow companies against commitments for the purchase of specific trust deed notes under arrangements evidenced by formal contracts or letter agreements.

2. Stanley C. Marks testified that such deposits were charged to the account "Trust Deeds Purchased" if the purchase was expected to clear prior to the month-end; otherwise they were charged to the account "Deposits for Purchase of Trust Deeds" (Tr. p. 896). He further testified (Tr. pp. 895–896) that if the transaction was still incomplete at the end of the month, the amount in the account "Trust Deeds Purchased" was transferred to the deposits account. Accordingly, as a minimum, the certifying accountant should have described fully the nature of the item in a note to the financial statement.

3. The June 1, 1959, statement reflects "Trust Deed Inventory (at cost)" in the amount of $606,717, while the statement as at September 25, 1959, shows the same item in the amount of $571,616. Jordan failed to adjust this account to original cost by removing substantial overstatements of value resulting from LATD's erroneous accounting practices of bringing back into inventory at the *retail cost* to investors trust deeds rejected by investors within the five day period allowed, those trust deeds which investors returned to LATD after they became delinquent or otherwise in default, or trust deeds repurchased from investors in accordance with LATD's undertaking to liquidate investors' portfolios upon request.

4. While in arranging the certified statement as at June 1, 1959, Jordan did segregate under Current Assets inventory classified as "Trusts Deeds Not Immediately Available for Sale" in the amount of $236,742, and a corresponding item on the financial statement as at September 25, 1959, in the amount of $325,918, he made no disclosure, by footnote or otherwise, that such items were composed entirely of trust deeds which were delinquent, in default or in process of foreclosure. As at June 1, 1959, such defaulted trust deeds comprised 39% of total inventory and as at September 25, 1959, the percentage of inventory consisting of such delinquent obligations had risen to 57%.

5. Jordan's certificate covering his June 1, 1959, audit was dated July 27, 1959. In the course of the audit, Jordan obtained a letter dated June 15, 1959, from David Farrell certifying that the books of LATD reflected all assets and liabilities, contingent or otherwise, as at June 1, 1959, and that there were not then pending any actions which, in Farrell's opinion, would result in any financial loss to LATD. Actually, there was then impending a serious loss, approximately $157,000, in connection with the anticipated rescission of the arrange-

ment under which LATD had acquired the 800 identical trust deed notes from Goheen Construction Co.

6. The following comparison of LATD's balance sheet as at June 1, 1959, with the balance sheet as at May 31, 1959, (PX 9) discloses a clear case of "window dressing" specifically designed to obtain more advantageous treatment under SEC's net capital rule:

|  | Increase | Decrease |
|---|---|---|
| Inventory ............................... |  | $ 625,310 |
| Investors' Free Credit Balances .............. |  | 502,909 |
| Investors' Debit Balances ................... | $ 95,959 |  |

7. The following comparison of the certified financial statement as at September 25, 1959, with the next preceding balance sheet which, was as at August 31, 1959 (PX 13), shows an even more drastic difference:

|  | Increase | Decrease |
|---|---|---|
| Inventory ................................. |  | $1,102,372 |
| Investors' Free Credit Balances .............. |  | 2,064,835 |
| Investors' Debit Balances ................... | $512,785 |  |

8. These comparisons are unmistakable evidence of the wholesale introduction of trust deed notes into investors' accounts immediately in advance of the audit dates, in order to create an entirely unrealistic appearance of financial health and liquidity. Such accounting maneuvers have a three-fold effect on the ratio of aggregate indebtedness to net capital:

(1) reduction in inventory decreases the percentage deduction prescribed under the rule; (2) reduction in investors' free credit balances reduces aggregate indebtedness with a corresponding reduction in minimum required capital; (3) introduction of trust deeds into investors' accounts at prices in excess of cost establishes a profit and thereby increases net worth.

9. The foregoing comparisons must be considered in the light of the fact, as the certifying accountant must have known, that LATD introduces trust deed notes into investors' accounts merely by mailing out confirmations and debiting the accounts involved. This unilateral action by LATD is subject to rejection by the investor within five days.

E. Lack of Independence of Certifying Accountant

1. The defendants represented in the basic brochure which was in circulation at least until May, 1958, that the "books (of LATD) are audited montlhy by an Independent Certified Public Accounting firm." The "independent" certified public accountant, Robert F. Jordan, is identified in the basic brochure and in the first revised brochure in use at least as late as March, 1959, as a member of the "Professional Company Management." His photograph and a résumé of his background appear in the brochure along with those of LATD's other principal officers and executive employees. He was and is in no sense independent of the management of LATD. While for a time Mr. Jordan did prepare monthly statements of the financial condition of LATD, they were nothing more than adjustments of general ledger trial bal-

ances. The only "audits" that he has made of LATD to which he has attached his certificate were as at June 1, 1959, and September 25, 1959. His certificates in these instances are clearly lacking in integrity, and constitute "litigation certificates" rather than "the disinterested and objective viewpoint" which is the touchstone of the value of a certifying accountant. Montgomery's Auditing, Eighth Ed. 1957, p. 24.[14]

2. The June 1, 1959, and September 25, 1959, statements of financial condition report an account captioned "Customers' Open Contractual Commitments." This account represents the unexpended balance of cash deposits made by investors with LATD and collections of cash made for such investors by LATD. It is obvious from the evidence, and the Court finds, that the designation of this account by the caption "Customers' Open Contractual Commitments," instead of by an accurate description, such as "Customers' Free Credit Balances," or "Amounts Owed to Customers," (or even "Customers' Accounts," the caption used by LATD prior to June 1, 1959), was intended to be and is misleading. The Court also finds that the designation was dictated by management (Tr. p. 3305), with the objective of excluding the item from "Aggregate Indebtedness" in the computation made by the SEC pursuant to Rule 17 CFR 240.15c3–1. That Rule specifically includes customers' free credit balances within the term "Aggregate Indebtedness" and excludes a broker or dealer's liabilities on "open contractual commitments."

3. The classification of investors' free credit balances as open contractual commitments in the light of the definition of the term in the Rule is absurd, and it is clear that it was adopted by the certifying accountant as a litigation term.

4. Jordan's certified statements as at June 1, 1959, and September 25, 1959, include a reserve for contingencies under "Capital Stock and Net Worth." This classification would require that this reserve be a surplus reserve. However, as the SEC's experts demonstrated beyond dispute, the reserve cannot under any concept of generally accepted accounting principles be classed as a surplus reserve. It is a valuation reserve and as such must be shown as a deduction from an asset account, in this case, inventory.

5. Generally accepted accounting principles require that interim financial statements reflect a provision for estimated income taxes which will be payable on net profits realized during the interim periods. This principle is well expressed in the first of the SEC's Accounting Series Releases.[15]

6. Neither of the two interim period statements certified by Mr. Jordan included the required provision for estimated income taxes. Mr. Jordan recognized this deficiency and attempted to overcome it with a note stating that no provision has been made for income taxes applicable to income for the interim periods. This is, of course, an inadequate substitute for proper accounting practices.[16]

14. In fairness to Mr. Jordan the Court should point out that he testified at the hearing on the motion for preliminary injunction that he did not authorize LATD to publish a condensed (and highly misleading) statement of financial condition as at September 30, 1958, stated to have been prepared by Robert F. Jordan, Certified Public Accountant, which appeared in the Los Angeles Times. He testified that he was not advised that the statement might be so circulated over his name and that he objected thereto. Mr. Jordan did not appear as a witness at the trial on the merits, except to identify, as an adverse witness called by the SEC, his working papers.

15. Release No. 1210 under the Securities Act of 1933, January 6, 1937. Defense counsel attacked this reference on the ground that the requirement applies only to registration statements filed with SEC. However, as indicated in SEC's Accounting Series Release No. 4, quoted in the next footnote, the SEC's accounting requirements are based on generally accepted accounting principles.

16. SEC's Accounting Series Release No. 4, April 25, 1938, states: "In cases

**F. Misleading Published Financial Statements**

1. While this litigation has been pending, LATD has published in Los Angeles and other newspapers a number of highly condensed, distorted and misleading statements of financial condition.

2. The certified financial statement as at September 25, 1959, which purports to establish a total net worth of $904,631, shows "Cash on Hand and in Banks" in the amount of $2,209,271, and "Deposits for Purchase of Trust Deeds" in the amount of $965,276. These two items were condensed in the published financial statement and entitled "Cash" and "Cash Deposits," in order to create the misleading impression that the $965,276 deposited by LATD with title and escrow companies to meet commitments for the purchase of trust deed notes represented demand deposits with banks, and to create an entirely deceptive and misleading appearance of liquidity.

3. The certified financial statement as at September 25, 1959, reported "Trust Deed Inventory (at cost)" under three classifications, the largest of which was "Not Immediately Available for Sale" comprising 57% of total inventory. This item consists entirely of trust deed notes which are delinquent, in default, or in process of foreclosure. The necessity for showing this item separately is obvious. The published balance sheet, however, completely disregards the importance thereof and states the entire inventory under the single caption "Trust Deeds (at cost)."

4. The certified statement as at September 25, 1959, while neglecting to make necessary provision for estimated income taxes, did at least direct attention to the deficiency in a note on the face of the balance sheet. The published

financial statement contained no reference to the omission of any provision for income tax, a significant and ascertainable liability, which in accordance with accepted accounting principles should have been disclosed.

5. These and other deficiencies in the published financial statement as at September 25, 1959, were intended to and did present the financial condition of LATD in a grossly misleading light. The published statement was condensed by the defendant Stanley C. Marks at the request of and was signed by David Farrell as President of LATD. The published financial statement of LATD as at June 1, 1959, was equally misleading.

## VIII

## THE AFFIRMATIVE DEFENSES

**A. Summary of Defenses**

1. The defendants have set up four affirmative defenses in their answer to the amended and supplemented complaint: *First*, that the SEC is without jurisdiction over the defendants as they are not "dealing in securities." *Second*, that the trust deed notes are exempt from registration under Section 4(1) of the Securities Act, 15 U.S.C.A. § 77d(1), (elaborated, in the course of argument, to mean the second clause of the section, exempting from the registration requirements "transactions by an issuer not involving any public offering"). *Third*, that "in furnishing a new, and needed service" by establishing a market in trust deed equities the defendants "have suffered the fate of other pioneers" in that their motives have been misunderstood, and that certain advertising agencies mistakenly employed the terms "investments" and "securities" in describing defendants' business, but that, as the SEC knew at the time the action was brought, the defendants had discontin-

---

where financial statements filed with this Commission pursuant to its rules and regulations under the Securities Act of 1933 or the Securities Exchange Act of 1934 are prepared in accordance with accounting principles for which there is no substantial authoritative support, such

financial statements will be presumed to be misleading or inaccurate despite disclosures contained in the certificate of the accountant or in footnotes to the statements provided the matters involved are material."

ued the use of such terms. *Fourth*, that the defendants have attempted to conduct "an honest, honorable, and ethical business and to comply with all applicable laws, and all rules and regulations having the effect of law, and that in areas where differences of opinion have arisen between the staff of the SEC and defendants' counsel, the defendants have followed the advice of their counsel, but seek from the Court declaratory relief of some unspecified nature as to the application of the statutes administered by the SEC.

2. Although not mentioned in the answer, the defendants also contend that LATD is entitled to exemption from registration under the "intrastate exemption" set forth in Section 3(a) (11) of the Securities Act, 15 U.S.C.A. § 77c(a) (11).

3. The Court has examined each of the "affirmative defenses" and finds them to be entirely without merit.

## B. Burden of Proof of Exemption

■ 1. Exemptions from the general policy of the Securities Act requiring registration of securities offered or sold through the mails or the facilities of interstate commerce "must be 'strictly construed' against the claimant of its benefit, * * *." S. E. C. v. Sunbeam Gold Mines Co., 9 Cir., 1938, 95 F.2d 699, 701. The claimant of any such exemption must affirmatively establish that exemption from the registration requirements is, in fact, available. S. E. C. v. Ralston Purina Co., 1953, 346 U.S. 119, 126, 73 S.Ct. 981, 97 L.Ed. 1494. Cf. Edwards v. United States, 1941, 312 U.S. 473, 482, 61 S.Ct. 669, 85 L.Ed. 957.

2. The defendants have failed entirely to establish any basis for exemption of the securities issued under the Secured 10% Earnings Program from the registration requirements of the Securities Act.

## C. Lack of Basis for "Private Offering" Exemption

1. The exemption asserted under the second clause of Section 4(1) of the Securities Act, 15 U.S.C.A. § 77d(1), is entirely specious and lacking in merit. The defendants contend that the instruments being offered under the Secured 10% Earnings Program must be considered solely as distinctive trust deeds and that the entire arrangement between LATD and the investor must be measured strictly by the terms of the "purchase authorization" without reference to the representations, promises and inducements held out by the defendants in the brochures, sales literature and through other advertising media, and that the Court must consider their claim of exemption within the narrow orbit so defined.

2. The defendants then assert that LATD has devised a policy under which, in the event a specific trust deed is confirmed out or introduced into the accounts of three investors, each of whom rejects it, the trust deed is then treated as unsuitable for introduction into the account of a fourth investor and is disposed of through other channels.[17]

■ 3. The Court rejects the contention that, in evaluating the nature of the instruments being offered and the nature of the offering, it is confined to the narrow area marked out by defendants. The "terms of the offer, the plan of distribution, and the economic inducements held out to the [investor]" S. E. C. v. C. M. Joiner Leasing Corporation, 1943, 320 U.S. 344, 353, 64 S.Ct. 120, 124, 88 L.Ed. 88, must be taken into account in reaching an appropriate classification of the instruments being offered. The offering must be judged by what it is represented to be. The representations and inducements held out to the investor, through elaborate brochures such as those used by defendants, or even ver-

17. Presumably to some speculator who may purchase the trust deed as a "discard" from the Secured 10% Earnings Program or through Real Estate Dis- posal Corporation, a corporation organized and controlled by David Farrell as a medium through which to dispose of "troubled" trust deeds.

bally, enter into and become elements of the contract or arangement with the investor just as though they were written into the "purchase authorization" used by LATD.

4. There can be no doubt that the multitude of investors to whom the Secured 10% Earnings Program is addressed are in need of the "full measure of protection" S. E. C. v. W. J. Howey Co., 1946, 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244, which the registration process established under the Securities Act is designed to accomplish.

5. As the Supreme Court stated in S. E. C. v. Ralston Purina Co., 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494, in the light of the "design of the statute * * * to protect investors by promoting full disclosure of information thought necessary to informed investment decisions," the question whether the "private offering" exemption is applicable "should turn on whether the particular class of persons affected needs the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.' "

6. In a footnote to its opinion the Supreme Court quoted Viscount Somers' dictum in Nash v. Lynde: " 'The public * * * is of course a general word. No particular numbers are prescribed. Anything from two to infinity may serve: perhaps even one, if he is intended to be the first of a series of subscribers, but makes further proceedings needless by himself subscribing the whole.' " [1929] A.C. 158, 169. After quoting, also in a footnote, from an advisory opinion by the General Counsel of the SEC (1935), 11 Federal Register 10952, that "an offering to the members of a class who should have *special knowledge* of the issuer is less likely to be a public offering than is an offering to the members of a class of the same size who do not have this advantage * * *" the Supreme Court, in deciding that the "private offering" exemption was not available in the situation before it concluded (346 U.S. 127, 73 S.Ct. 985), "The

focus of inquiry should be on the need of the offerees for the protections afforded by registration. The employees [offerees under a company plan to make unissued stock available to employees]. here were not shown to have access to the kind of information which registration would disclose * * *."

7. Measured by the foregoing standards, it is evident that no basis whatever exists to apply the "private offering" exemption to the defendants' Secured 10% Earnings Program.

D. Lack of Basis for "Intrastate Exemption"

1. Belatedly, about August, 1959, LATD attempted to "spin-off" hundreds of accounts of investors under the Secured 10% Earnings Program who were non-residents of the State of California by transferring those accounts to TD&MM, a dormant shell of a corporation, and thereafter confining the offering by LATD to residents of California, in order to establish a basis for a claim of exemption from the registration requirements of the Securities Act, pursuant to the "intrastate exemption" set forth in Section 3(a) (11) of that Act, 15 U.S.C.A. § 77c(a) (11), exempting from registration—

"Any security which is a part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corporation, incorporated by and doing business within, such State or Territory."

2. None of the capital stock of TD& MM has been issued, but it has been arranged that when such stock is issued TD&MM will become a wholly owned subsidiary of LATD. Indeed, from any realistic point of view, TD&MM is now and has been at all times a mere department of LATD.

3. More or less contemporaneously with the transfer of the accounts belonging to nonresident investors to TD&MM, those investors were solicited to execute

new purchase authorizations running to TD&MM rather than LATD, but, admittedly, not all such investors were amenable to the new arrangement. Accordingly, an undetermined number of accounts of investors, non-residents of California, since August, 1959, are being serviced by TD&MM under purchase authorizations running to LATD.

4. The attempted separation of accounts between LATD and TD&MM in an effort to establish a statutory basis for exemption *as to LATD* under Section 3(a) (11) of the Securities Act, 15 U.S.C.A. § 77c(a) (11), was and is entirely ineffectual, as TD&MM is a mere department or division of LATD. The investment plan being offered directly by LATD and, since August, 1959, by TD&MM, is an identical plan, whose component elements are not admissible of separation into separate and distinct "issues" of securities, in order to establish a basis for exemption for either LATD or TD&MM.

5. All trust deed notes offered by LATD and TD&MM are first brought into inventory by LATD, and then introduced into the accounts of investors under the basic Secured 10% Earnings Program, regardless of whether the accounts are on the records of LATD or TD&MM. As shown by the consolidated balance sheet of LATD as at September 25, 1959, TD&MM carries no inventory of trust deed notes. The allocation of investors' accounts between LATD and TD&MM is a mere subterfuge intended to defeat and evade the registration requirements of the Securities Act, and to create an artificial basis for the assertions of the defendants that the "intrastate exemption" is applicable.

6. The same situation exists with respect to the offering of the Secured 10% Earnings Program to residents of Colorado by Colorado Trust Deed & Mortgage Markets. (CTD&MM), a corporation recently organized to extend the offering of the Secured 10% Earnings Program to residents of Colorado. David Farrell now owns 100% of the capital stock of CTD&MM.

7. The terms and conditions under which the Secured 10% Earnings Program is offered by LATD, TD&MM and CTD&MM are identical. The format and contents of the several offering brochures and the form of purchase authorization employed by each are identical, except in inconsequential respects.

8. The applicable legal principles are clearly stated in Hillsborough Investment Corporation v. S. E. C., 1 Cir., 1960, 276 F.2d 665, 667. There Hillsborough Investment Corporation, chartered under New Hampshire law, as issuer of certain securities which had been sold in reliance upon the "intrastate exemption," which was, however, unavailable because of sales to non-residents of New Hampshire, after entry of a preliminary injunction, undertook to create "new" securities to be exchanged with existing resident shareholders. The District Court, 176 F.Supp. 789, found this to be "an open and calculated attempt to avoid" the preliminary injunction and issued a permanent decree extending to "any of the securities" of the issuer. The Court of Appeals affirmed:

"Under the statutory scheme as construed, an entire issue must be sold only to residents or the exemption is lost, and once the exemption is lost, the use of interstate facilities in any sale, to resident or non-resident without registering the security is a violation of the Act. Provisions for injunctions against future violations by the use of interstate facilities are set forth in the Act, and make available the processes of civil contempt.

"An issuer that has lost the exemption as to one issue of securities by a non-resident sale, does not have the opportunity to regain the legal use of interstate facilities or the mails by halting the non-resident sales and confining itself to sales to residents. But this is just what appellants seek by means of the substitute capitalization plan. Appellants' changes in the authorized securities and plans for the substitution of cap-

italization and their claim of exemption is an attempt to do indirectly what the statutory provisions do not allow."

## IX

## JURISDICTIONAL EVIDENCE

1. The defendants have introduced into the mails, and into the channels of interstate commerce, countless thousands of brochures and other selling literature describing the Secured 10% Earnings Program, in addition to advertising their investment plan through the media of newspapers, radio and television. This mass advertising, according to the testimony of David Farrell, is intended as a means of informing members of the public of the advantages of investing in discounted second trust deeds through the facilities made available by the defendants. The Court finds, however, that the true purpose of the defendants' saturation approach is to condition the minds of investors, through incomplete, ambiguous, highly flamboyant, misleading, deceptive and untrue statements of material facts, to rely upon certain basic misrepresentations which mark all such advertising. These basic misrepresentations are, in substance, that the defendants have developed a new, distinctive and entirely unique investment plan under which investors may commit their savings to the defendants and be assured of safety and liquidity, while at the same time enjoying "Secured 10% Earnings."

2. The intended meaning and import of the design, appearance and content of the brochures and other sales literature, so widely distributed by the defendants, is that LATD is a long established, stable and sound financial institution of the highest integrity and standing in the financial community, to which investors, whatever their financial situation or investment needs, may entrust their funds with absolute confidence.

3. As applied to securities such as those offered under the Secured 10% Earnings Program, three basic elements ordinarily determine and control an investor's decision whether or not to invest. These elements are safety, yield or income, and liquidity. Any suggestion that the issuer or distributor of such securities may misrepresent any one of these elements without impinging upon those provisions of the federal securities laws, enacted to prevent fraud and deceit in the sale of securities, is entirely unacceptable. The defendants, from the inception of the Secured 10% Earnings Program, have continuously misrepresented all three such elements, and have, with marked success, succeeded in convincing many thousands of small investors that the Secured 10% Earnings Program constitutes a safe, secure and certain method of realizing earnings of 10%, which may be compounded monthly, and pyramided indefinitely to enormous totals, through "continuous reinvestment." This widespread deception of investors has been and is now being accomplished through the defendants' extensive use of the mails and the facilities of interstate commerce.

## X

## GROWTH OF SECURED 10% EARNINGS PROGRAM

1. The basic and all subsequent brochures describe LATD as "America's Oldest and Largest" institution offering investments in notes secured by deeds of trust. This representation was made in the basic brochure notwithstanding the fact that at the time (December, 1957) it was first published the Secured 10% Earnings Program, as developed by LATD under the sponsorship of TD&ME, had been offered to the public for less than one year, and that other institutions were offering similar investment plans. While it is probably true that at the present time, measured by dollar deposits received from investors, LATD is the largest organization offering an investment program based upon discounted second trust deeds, the representation that it is "America's Oldest and Largest" is intrinsically misleading. It is noteworthy that for the fiscal year ended March 31, 1957, just eight months before LATD originated the imposing slogan

"America's Oldest and Largest," which has since been superimposed in its brochures upon the photograph of what resembles a bank vault, LATD, as a then struggling enterprise, had shown a deficit of $17,214, and during the first six months of 1958, issued some 100 checks against insufficient funds.

2. As early as July, 1957, LATD was using a letterhead imprinted: "Franchised Affiliates in All Principal Cities." Except for its main and branch offices in the greater Los Angeles area and branch offices in San Diego, Santa Barbara and San Francisco, California, even as late as May, 1958, LATD had no other sales outlets and had no franchised affiliates. The San Francisco office was not established until about April, 1958. Neither LATD nor TD&ME established any office or "franchised" any affiliate outside the State of California, until Colorado Trust Deed & Mortgage Markets was established about June, 1959.

3. LATD is now servicing the accounts of at least 8,000 investors under the Secured 10% Earnings Program, including many individuals in very modest financial circumstances who are entirely uninformed and unsophisticated with respect to investment securities and the risks and hazards incident to the Secured 10% Earnings Program. Such investors are encouraged to liquidate investment securities or to transfer their savings to LATD in order to invest under the Secured 10% Earnings Program. The purchase authorization executed by investors includes a transfer draft to be used in authorizing the transfer of funds deposited with banks, savings and loan associations and other financial institutions.

4. During the fiscal year ended March 31, 1958, LATD was entrusted with more than $5,000,000 for investment under the Secured 10% Earnings Program. As of September 30, 1958, LATD was receiving in excess of $1,000,000 monthly from investors. The flow of cash from investors to LATD has shown a substantial increase since September 30, 1958. By August, 1959, LATD's total volume of business had grown to more than $20,000,000. At the present time, investors have deposited with and entrusted to LATD in excess of $40,000,000 under the Secured 10% Earnings Program.

XI

## EVIDENCE OF FRAUD

A. Introduction

1. The Court is not unmindful that the Court of Appeals, on the basis of the abbreviated record then before it, characterized certain statements contained in the defendants' offering brochures as mere "puffing," those such as " * * highest return obtainable with full protection and security." [264 F.2d 209] On the basis of the extensive proof of fraud and deceit now available, the Court finds that it is impossible in each instance to arrive at an absolute determination of the oftentimes thin dividing line between mere "puffing" and outright deceit and misrepresentation, and to effect an absolute segregation of the one from the other. The Court does find that each of the objectionable statements are so intertwined with other definite and intentional misrepresentations that, when used in an offering of such "intricate merchandise" as the securities being sold under the Secured 10% Earnings Program, in the light of the extensive conditioning of the minds of investors to regard the Secured 10% Earning Program as an entirely safe, secure, solid and stable investment medium, such statements are materially misleading.

2. Such representations as "an income for life" implies much more safety than can be found in second trust deeds to be issued in the indefinite future. Assuming the correctness of the mathematical computations contained in the statistical tables set forth in the brochures, the implication that "full, firm 10% earnings" can be safely and securely received for a period of twenty years from second trust deeds, comparable to earnings from insured bank deposits or insured savings and loan association investment certificates, is extremely misleading. The unsophisticated investor may not realize

that the high interest rate necessarily reflects a high risk. This type of discussion of appreciation of capital without explanation of "the market risks inherently involved in the investment" has been set forth by the SEC as an example of what it believes false and misleading under the Securities Act and the Investment Company Act in a Statement of Policy dealing with literature used in the sales of investment company shares. The Statement of Policy has been generally accepted by the industry.[18] Similarly, the statement that no investor has ever sustained a loss even if true, which the evidence now demonstrates to be false, as a minimum, requires an explanation that the program had been in effect for only a comparatively short time.

3. Bearing in mind the importance of safety and rate of return in the purchase of securities, the defendants' untruthful statements promising "10% earnings" with nearly absolute security reach the very heart of the considerations influencing the normal investor. Thus, in connection with a sale of first mortgage real estate bonds and other securities, a promise of "absolute safety" and "elimination of investment risk," together with additional statements falsely indicating a high quality and high return was the basis for a criminal conviction, even before the enactment of the Securities Act, under the more restricted language of the mail fraud statute. Busch v. United States, 8 Cir., 1931, 52 F.2d 79, 84, 85. Furthermore, the express misrepresentations such as that LATD "is the oldest and largest" institution of its kind, that it provides an "exchange" for trust deed notes, "just as the 'Stock Exchange' does for stocks and bonds," and that its books are "audited monthly by an independent Certified Public Accounting firm" seek to induce an illusion of safety and liquidity which, in the circumstances disclosed

in the course of the trial, cannot be considered mere exaggeration. Cf. Sewell v. Federal Trade Commission, 9 Cir., 1956, 240 F.2d 228, reversed 1957, 353 U.S. 969, 77 S.Ct. 1055, 1 L.Ed.2d 1133, with direction to affirm and enforce an order of the F.T.C. prohibiting the dissemination of certain misleading advertisements.

4. It is undeniable that since this litigation was begun, the defendants have made some refinements in certain of the cruder misrepresentations running through the elaborate brochures describing the Secured 10% Earnings Program. For example, presumably because of the impact of the opinion of the Court of Appeals, the statement that "the only legal difference between a first or second deed of trust is that one was recorded prior to the other" has been deleted from the current brochure. The defendants, however, have not included in any brochure a clear and meaningful examination of the important and basic distinctions between first and subordinate trust deeds, and the serious risks implicit in investments in subordinate obligations. On the contrary, in confirming to investors trust deeds carrying subordination clauses, covering raw units of land, the defendants have described them as First Trust Deeds, without disclosing on the confirmations, or otherwise, that they were subject to subordination to subsequent trust deeds given to secure construction loans in indefinite amounts. That could not have been mere negligence for the reason that in such instances *special* confirmation forms were devised and printed by the defendants.

5. Another example of the misleading nature of the confirmations which LATD sends to investors in introducing trust deeds into their accounts, as well as of the community of interest which exists among investors, was exposed in the course of trial by evidence establishing

---

18. For example, the Statement of Policy states that it will be materially misleading: "To discuss accumulation of capital, preservation of capital, accumulation of an estate, protection against loss of purchasing power, diversification of invest-

ments, financial independence or profit possibilities without pointing out or explaining the market risks inherently involved in the investment." 15 Federal Register 5468.

the following situation: LATD acquired from a subdivider 431 trust deeds created against small units of raw land comprising a proposed subdivision situated in Orange County, California. The 431 trust deed notes, which had an aggregate face value of $650,000, were acquired by LATD at a gross cost of $520,000.

6. The special forms of confirmations which LATD devised to introduce the 431 trust deeds into the accounts of investors contained the following information: " * * * Prior Lien * * * Blanket First Trust Deed of $706,000 covers entire property, which if prorated would equal $1,360 on this particular portion [the second trust deed confirmed to the investor]". The confirmations did not disclose that the first deed of trust contained no release clause, and that as the prior lien was held by an estate, then under administration, Court approval would be required in order to modify the terms of the first trust deed.

6. Similarly, the statement that funds received from investors are "deposited in a separate trust account" has been deleted from the brochures. The fact remains, however, that at least twenty-five thousand brochures containing that misrepresentation were disseminated to investors through the mails and in interstate commerce, and it is a fair and reasonable inference from the evidence that, in establishing accounts with LATD, countless investors relied upon the unequivocal statement that the funds which they entrusted to LATD were so safe-guarded. The defendants have never corrected the misrepresentation or made any affirmative disclosure of the fact that all funds entrusted to LATD by investors are in fact commingled immediately with its general funds and used to purchase trust deeds for inventory, to carry the very substantial debit balances in accounts of investors who are investing on installment terms or through the "continuous reinvestment" program, and otherwise used in the conduct of the business of LATD, except by the following note which appears in the form of a purchase authorization first used about

October, 1958, after the SEC had unearthed the fact that the defendants had commingled, misapplied and misappropriated funds entrusted to LATD, and so accused the defendants in the amended and supplemental complaint filed on October 8, 1958:

"Note: We act only as principal and not as agent in the buying and selling of Trust Deeds. All funds handed us by customers to purchase Trust Deeds are placed in our general account and not in any individual, segregated or other Trust Account."

7. It is admitted, and the Court finds, that many of the thousands of investors whose accounts were established with LATD by October, 1958, have never executed the new purchase authorization, and that the accounts of those investors are still being serviced by LATD under the old purchase authorization containing no such disclosure. The Court also finds that the device adopted by defendants in hiding the note within the technical language of the purchase authorization, rather than making a forthright and affirmative disclosure in the offering brochure, is merely another instance of the contrived and artful efforts of the defendants to avoid meaningful disclosure of highly material and significant facts touching upon the essential elements of the Secured 10% Earnings Program.

Likewise, the earlier misrepresentation that the Secured 10% Earnings Program "assures investors of continuous '10%' earnings from [their] savings" has not been ameliorated except by statements describing the "10% earnings" as a "full, firm return," which in the context of the current brochure and other offering literature, are equally misleading.

8. Nor have the defendants affirmatively disclosed in any brochure or other offering literature that the funds deposited by investors and not the capital funds of LATD are used to "warehouse" or bring trust deeds into "inventory," although the representation that LATD uses its own funds to "warehouse" trust

deeds has been dropped from the brochure. The equally misleading representations that LATD "screens," "appraises" and "selects," "prime" and "trouble free" trust deeds where substantial underlying equities exist, remain in the current offering brochure. Indeed, these misrepresentations have been attenuated and elaborated upon.

9. The Court cannot and does not accept the contention of the defendants that, because after exposure in the course of trial, some of the more misleading misrepresentations have been removed from the offering brochure or ameliorated by subtle refinements of language, the SEC is not entitled to an injunction to prevent the defendants from engaging in similar acts of deception. The SEC cannot be deprived of its clear right to injunctive relief by defendants' rearguard action in softening some, but by no means all, misrepresentations which infuse and permeate the several offering brochures.

10. The Court, on the contrary, adopts the standard expressed in S. E. C. v. Culpepper, 2 Cir., 1959, 270 F.2d 241, 249:

"The critical question for the court in cases such as this is whether there is a reasonable expectation that the defendants will thwart the policy of the Act by engaging in activities proscribed thereby. As the court said in United States v. W. T. Grant Co., 345 U.S. 629, at page 633, 73 S.Ct. 894, at page 897, 97 L.Ed. 1303:

"The case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' United States v. Aluminum Co. of America, 2 Cir., 148 F. 2d 416, at page 448. The burden is a heavy one * * *.

*   *   *   *   *   *

" * * * The existence of seasoned stock on its face indistinguish-able from the tainted stock, make dealings in the stock particularly difficult to police. *Surely the Commission should not be required to keep these appellants under surveillance and to bring a subsequent injunction action if they commence again to sell tainted stock. We hold that the exercise of discretion as made below was in full accord with the facts and the law.*" (Emphasis supplied.)

11. In United States v. Parke, Davis & Company, 1960, 362 U.S. 29, 49, 80 S.Ct. 503, 514, 4 L.Ed.2d 505, the Supreme Court said:

"On the record before us the Government is entitled to the relief it seeks. The courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities. A trial court's wide discretion in fashioning remedies is not to be exercised to deny relief altogether by lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit. See United States v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978.

B. Manipulation of Investors' Accounts to Realize "Windfall" Profits

1. Although LATD represents to investors that they may "earn" more than 10% on trust deed notes held in their portfolios in the event the trustors liquidate their obligations in advance of maturity, thereby establishing "windfall" profits to the investors, it has been the consistent practice of LATD, in such situations, to withdraw such trust deeds from investors accounts and secretly appropriate the profits to itself. The following is a clasic example of such gross overreaching of investors.

2. On April 1, 1959, LATD purchased 43 notes secured by second deeds of trust on Tract 3068, known as Riviera I and

Riviera II.[19] The homes were constructed on leasehold estates. Each note had a face value of $3,500. LATD purchased the notes for $2,345 each and sold them to its investors for an average of approximately $3,213 each, realizing a profit on the 43 notes of $37,353. Under date of September 29, 1959, LATD received notice that an escrow had been established with Newport Balboa Savings & Loan Association under which the 43 notes were to be satisfied in full, in advance of maturity, and a request that LATD forward the original notes, deeds of trust, signed requests for reconveyance and its demands for reconveyance. The notice also stated that, "They will of course be used only when we hold for your account the full amount of your demand."

3. In October, 1959, LATD sent form letters to the investors in the 43 trust deed notes advising them, in part, " * * We find it desirable to repurchase this Deed of Trust at this time in accordance with our regular procedure whenever further action is required. The price to repurchase the Deed of Trust will be credited to your purchase authorization."

4. By letters dated October 19 and 20, 1959, LATD transmitted to Newport Balboa Savings & Loan Association 28 of the 43 notes and deeds of trust, specifying that the Association could deliver them to the parties in interest when it held for LATD the sum of $3,426 each (face value), with interest at the rate of 7% per annum until the date received.

5. LATD, during October, 1959, removed the 43 deeds of trust from the investors' accounts, crediting each account $3,190, although LATD anticipated receiving $3,426 for each such deed of trust on reconveyance or an additional and secret profit of $9,897. The investors were not advised that LATD was to receive the full balance due on the notes, nor were they given the opportunity of determining whether they themselves should reconvey and realize the additional profit.

6. The entire sequence of events in which LATD sought to appropriate the "windfall" profits belonging to investors, in callous disregard of their legal and moral obligations to such investors, is elaborately set forth in a schedule (PX 77), the accuracy of which is admitted by the defendants. In this instance, the fact that LATD had retained title to 20 of the 43 trust deeds as "Trustee" for the investors facilitated its unilateral removal of the trust deeds from the accounts of those investors. In such instances, LATD merely advised the investors that the trust deeds were being removed from their accounts.

7. In another and unrelated situation, on March 20, 1959, LATD purchased trust deed No. 7195M for $3,274, and on May 1, 1959 sold it to Benjamin C. Griswold for $4,112. About August 4, 1959, LATD received a letter from Bank of America advising that the trustor had opened an escrow in order to liquidate his obligation in advance of maturity, and requesting that LATD forward the necessary papers, together with its demand for their use.

8. On August 20, 1959, LATD forwarded the necessary instruments to Bank of America and advised that the unpaid principal balance of the note was $4,377 with interest paid to June 1, 1959. On September 8, 1959, Bank of America mailed to LATD a check in the amount of $4,459, representing the entire balance due on the note. On September 9, 1959, LATD advised the investor as follows:

"We find it necessary to withdraw this Deed of Trust at this time. This is according to our regular procedure whenever further action is required."

On September 18, 1959, the ledger account of the investor was credited with $4,027. The ledger card contains the notation "Repurchased TD–7195."

9. The investor was not notified by LATD that it had received settlement

19. The 43 trust deed notes were acquired from Aero Properties, Inc. The evidence strongly suggests, but does not fully establish, that David Farrell had a 50% stock interest in that company.

878

in full of the balance due on the note. The "further action" required in this situation was simply the appropriation by LATD of the difference between the $4,459 received from the trustor and the $4,027 credited to the account of the investor, or the sum of $432 which rightfully belonged to the investor.

10. In still another such situation, in July, 1959, LATD received a letter from the trustor of deed of trust No. 7177, stating, " * * * we are planning to sell and the purchaser is desirous of paying off my note to you * * *" On July 31, 1959, LATD advised the trustor that "the unpaid principal balance is $1,321.24 with interest paid to July 1, 1959." On August 19, 1959, LATD addressed a letter to Security First National Bank stating, "We have been advised that an order has been opened with you which is to include payment in full of the principal balance, together with interest, of the deed of trust covering the referenced property" (Trust Deed No. 7177). LATD enclosed the original note and trust deed, and advised the bank that the unpaid balance of the note was $1,321.24 with interest paid to July 1, 1959.

11. On August 19, 1959, LATD advised the investor to whom the trust deed note had been sold:

"We find it necessary to withdraw this Deed of Trust at this time.

This is according to our regular procedure * * *"

On August 20, 1959, LATD removed Trust Deed No. 7177 from the account of the investor, crediting the account $1,-213. On September 2, 1959, LATD received from Security First National Bank of Los Angeles a check in the amount of $1,335. On September 9, 1959, the ledger account of the investor was credited with $1,335. On September 18, 1959, the entry was reversed. A handwritten notation on the ledger card states "Payment posted to this account in error. See repurchase of same above."

12. The investor, of course, was not advised that LATD had appropriated the "windfall" profit under circumstances which could not have resulted from mistake or inadvertence.

C. "Earnings" on Uninvested Funds Entrusted to Los Angeles Trust Deed & Mortgage Exchange

1. It is represented by LATD and TD&ME that an investor who opens a new account under the Secured 10% Earnings Program or who makes an addition to his existing account by the twentieth of the month "earns" 10% from the first of the month. The following regularly appears in TRUST DEED TOPICS, a monthly publication of TD&ME:

Remember * * * accounts opened by the 20th * * * or additions received by the 20th * * * earn from the 1st!

LATD commits itself to credit monthly to the account of and, at the option of the investor, to remit to him an amount equal to ¹⁄₁₂th of 10% of the amount so deposited, regardless of the length of time the funds remain uninvested by

assignment of a specific trust deed note to the investor's account.

2. Although the defendants represent to investors that funds received by LATD before the 20th of the month *"earn"* from the first, in actual practice when an in-

vestor, who elects to receive a monthly check covering his 10% earnings opens a new account under the Secured 10% Program his account is credited on the Investors Ledger with the amount deposited, and while his funds remain uninvested his account is *debited* each month by an amount equal to ½th of 10% of his deposit as a "miscellaneous charge" against the account, thereby reducing, on the Investors Ledger, the investor's credit balance and the corresponding liability of LATD to the investor. The investor however, does not receive such information.

3. One of the most cruelly misleading devices employed by LATD is sending to each investor monthly a Condensed Summary of his account. The last column of the Condensed Summary is entitled "Estimated Liquidation Value of All Assets in Your Account." This column represents nothing more than the projection, monthly, by LATD of total deposits and "earnings" of ten per cent compounded monthly, stated in terms of dollars, without any regard whatever to the actual liquidation value of the account.

4. For example, an investor who deposited $1,000 with LATD on January 1, 1960, would receive at month end a Condensed Summary showing that his account had grown to $1,008.33, by the second month end to $1,016.73, and by year end to $1,104.71. The Condensed Summary translates into specific terms, for each investor, the misleading growth tables set forth in the current and all earlier brochures. The "estimated liquidation value" is sent to each investor regardless of whether his account has ever been invested in a trust deed, and regardless of whether his account contains nothing except defaulted trust deeds. It is through the Condensed Summary that LATD keeps each investor satisfied that his investment is safe and secure, and that his capital is accumulating in accordance with the promised growth schedule. LATD's explanatory comment that the "right hand column is a computed summary of what we consider to be the cash value of your account at this time" adds to its misleading quality.

5. Some investors who seek to liquidate their accounts are soon disillusioned. For example, an investor who had received such a summary showing an estimated liquidation value of $2,650, on an investment of $2,500, attempted to liquidate his account. He was advised by Frank Stark, a Vice-President of LATD and Manager of its San Francisco office, that "you did not have a trust deed in your account, and we cannot by law pay you any interest." Another investor, a resident of Massachusetts, under similar circumstances, lost the interest which he would have earned over several months on $20,000, which he had withdrawn from savings and loan associations to deposit with LATD.

D. Background of Certain Executive Officers of LATD

1. The defendants emphasized in the basic brochure that "Responsibility goes hand in hand with integrity." The brochure included a photograph and short statement of the background of each of the managing officers of LATD, including the following with respect to C. W. Cannon, who until April 1, 1958, was LATD's Comptroller:

"C. W. Cannon, Comptroller, Former Attorney, 7 years Auditor and Branch Manager Citizens National Bank; 12 years Branch Manager Bank of America; Credit Department, Federal Reserve Bank."

It was then known to LATD's management that C. W. Cannon had been disbarred from the practice of law following his conviction some years earlier of grand theft.

2. Similarly, the current brochure contains the following résumé of the background of "our president," David Farrell:

"Formerly Secretary-Treasurer and co-owner of Home Mortgage & Investment Co., Inc.; Captain USAAF, WWII Pilot. Two years German prisoner of war. Created market and developed sales of orig-

inal Contour Chair Lounge; owned stores in 14 cities throughout nation. Former Stock Broker, owner of David Farrell & Co., former member of National Association of Securities Dealers."

The brochure omits to state that Associated Distributors, one of David Farrell's enterprises, went through bankruptcy, and that Mr. Farrell himself filed a voluntary petition in February, 1949, and was discharged as a bankrupt in May, 1949 (Tr. pp. 2165, 2166).

E. Defendants' Legal Status

1. Shortly after the SEC filed its Amended Complaint on October 8, 1958, the defendants, through a Chicago public relations firm, issued a press release (PX 64) headed "SEC Accused of Malicious, Irresponsible Misrepresentations." The import of the press release was that the SEC and certain of its staff members were moved by corrupt motives in attempting to put the defendants out of business, that the legal action against LATD and TD&ME had been instituted without any investigation, that the SEC did not want a determination of the issues in a proceeding before the Court but intended to destroy the defendants' business through adverse newspaper publicity, and that the action of the SEC was irresponsible, vindictive and entirely without any legal justification.

2. At the trial of the action, both David Farrell and Oliver J. Farrell admitted that they could bring forth not the slightest scintilla of evidence that the SEC or any member of its staff was acting in these proceedings from any improper, corrupt or prejudiced motive, *although invited to do so by counsel for the SEC, even though their testimony might be hearsay.*

3. The Court finds, therefore, on the basis of all the evidence and proceedings before it, that this action was instituted by and has been carried forward by the SEC, on the basis of sufficient evidence of willful disregard by the defendants of the statutes which the SEC is charged with administering and enforcing. The Court further finds that, while, unfortunately, malice and deceit have entered into the litigation, those elements have been injected by the defendants and not by the SEC.

4. The Court finds that the defendants have intentionally misrepresented the nature of this litigation, the issues involved, the motives of the SEC and its staff members in bringing and carrying out these proceedings, and the rulings of this Court. This area of misrepresentation has extended even to the decision of the Court of Appeals, whose opinion has been so condensed and summarized in the March, 1959, issue of TRUST DEED TOPICS (PX 91) to make it appear that the Court of Appeals had exonerated the defendants of all accusations of fraud, deceit and illegality in the presentation of the Secured 10% Earnings Program. This publication of TD&ME was circulated among the then 6,000 investors under the Secured 10% Earnings Program, and through various other channels.

5. It is noteworthy that, in the course of trial, counsel for LATD refused to acknowledge, under a claim of privilege, whether he had reviewed and approved the distorted condensation of the opinion and decision of the Court of Appeals. The Court finds that the summary, so widely disseminated by the defendants, was designed to further ensnare investors already committed under the Secured 10% Earnings Program, and to bring into the web of deceit, which the defendants have so adroitly woven and now so blandly defend, an ever increasing number of investors eager to entrust their savings to an institution which assertedly has discovered a magic formula to earn 10% compounded monthly, without sacrificing safety or liquidity.

6. This litigation has served to refine, if not to remove, at least one of the defendants' more insidious misrepresentations.

7. From July 1, 1958, until March, 1959, the brochure used by LATD and TD&ME as definitive expositions of the Secured 10% Earnings Program included the following statement:

"Message From Our President: To Intelligent Investors Everywhere:

\* \* \* \* \* \*

"Legal aspects of our Secured 10% Earnings Accounts have been evaluated and approved by counsel for the company, Mr. Morgan Cuthbertson, former counsel for the Securities and Exchange Commission.[20] "

This representation was deleted from the current brochure, although that brochure, like the earlier one, includes Mr. Cuthbertson's photograph with the following summary:

"Morgan Cuthbertson. Prominent attorney regularly retained by the Company. Former counsel for the Securities and Exchange Commission; Member, American, California, Los Angeles and Federal Bar Associations."

None of the brochures makes the slightest reference to the instant litigation, although it must be assumed that Mr. Cuthbertson, as a former attorney for the SEC, is fully aware of the fact that the forms of registration under the Securities Act require disclosure of all material litigation, and that, considered from any viewpoint, and regardless of whether the SEC or the defendants prevail, these proceedings will have an important impact upon the welfare of investors, new and old. The Court finds that the deliberate, studied refusal of the defendants to set forth, in the brochures addressed to the investing public, a careful, fair and understandable résumé of the nature of the pending litigation is an inexcusable and calculated misrepresentation.

8. The manner in which misrepresentations of this nature reach down into the lower echelons, such as the 80 or more salesmen engaged in merchandising the Secured 10% Earnings Program, and through them to investors, appears from the following letter from a prominent attorney and executive, addressed to SEC's counsel, reporting his experience with a representative of LATD:

"I am enclosing herewith two letters which I received through the mail from the Pasadena office of the Trust Deed & Mortgage Exchange. The letter of September 24th, 1959, signed by George W. Pennington, is a follow-up of a telephone conversation I had with Mr. Pennington at my home on the evening of September 22nd, in which conversation Mr. Pennington made the flat statement that Trust Deed & Mortgage Exchange was operated under SEC supervision. This statement he stayed with for some discussion. I finally told him that if that was the type of misrepresentation they were indulging in, I didn't care to pursue the conversation. He urged me to talk with someone who he indicated was his manager, but I hung up the telephone."

The letter of September 24, 1959, from the representative of LATD follows:

"Just to ease your mind as to whether this organization is legitimate or not, our head counsel, Mr. Morgan Cuthbertson has spent thirteen years of his life with the Securities & Exchange Commission, so we are virtually under 'S.E.C.' supervision, although not under control of any government agency. This point would have been made clear to you had you remained on the telephone a little longer, as there was no desire to mislead you. However, we have to conform to all the rules and regulations governing this activity as well as all similar activities within the state.

"We shall welcome any further questions you wish to ask.

"Very truly yours
"George W. Pennington

"P.S. Persons more or less familiar with trust deeds know that it's no trick to make ten per cent or more for investors."

---

20. Mr. Cuthbertson was an Attorney employed in the Los Angeles Branch Office of the SEC.

## XII

## MISUSE OF INVESTORS' FUNDS TO FINANCE DAVID FARRELL'S REAL ESTATE SPECULATIONS

A. Introduction

1. The evidence establishes beyond question that LATD has become a medium through which funds entrusted to it by investors have been channeled into a variety of real estate speculations in which David Farrell has "participations", evidenced by a joint venture agreement or similar arrangement. The testimony and documentary evidence received in the course of the trial of this action has exposed, and forced the admission by David Farrell, that in numerous situations LATD has acquired, and brought into inventory under the Secured 10% Earnings Program, thousands of trust deed notes created against raw, vacant and unimproved real estate in connection with proposed subdivisions in which David Farrell has such a "participation."

2. The evidence also establishes that these trust deed notes, representing nothing more than a lien against a unit of raw land within such projected subdivisions, and having little or no value, in the event the plans of the subdividers do not materialize, have been introduced into the accounts of thousands of investors under the Secured 10% Earnings Program under circumstances of outrageous fraud, deceit and concealment.

3. David Farrell has admitted, in the course of his testimony (Tr. pp. 3397, 3398), that no disclosure whatever has been made to investors that their funds have been and are now being committed to finance his outside real estate speculations. He has testified before the Court, in substance, that he regards the use of such funds as entirely consistent with his obligations to investors, and with accepted business practices. His testimony in this area is consistent with the assertion made by all defendants who testified that, as LATD professes to act only as principal in its relation with investors, and as the purchase authorization so states, LATD owes no fiduciary responsibility to any investor.

4. The evidence establishes that David Farrell had such undisclosed "participations" in the following real estate subdivisions, in which LATD acquired trust deed notes and introduced them into the accounts of investors under the Secured 10% Earnings Program:

| Name of Tract | Date of Purchase by LATD | Number of Trust Deed Notes | Total Face Amount of Notes |
|---|---|---|---|
| Reedlands, Inc. | 8/25/58 | 48 | $ 240,000 |
| Scott Highlands | 9/18/58 | 320 | 320,000 |
| Hyacinth Homes | 9/22/58 | 71 | |
| Atwater Village #1 | 11/17/58 | 66 | 164,059 |
| Cimarron Meadows | 1/20/59 | 800 | 630,768 |
| Reedlands, Inc. | 3/ 9/59 | 200 | 468,572 |
| Dollar Estate | | 96 | 250,000 |
| Vanbilt Homes, Inc. | 9/ 3/58 | 16 | 102,000 |
| Embarcadero | 7/29/59 | 632 | 2,307,700 |

The Court expresses no opinion whether the commitment of funds entrusted to LATD by investors to the financing of these real estate speculations of David Farrell is consistent with the restraining order entered by the Court of Appeals.

5. The following statement of the circumstances under which certain trust deed notes were introduced into the accounts of investors, in situations in which David Farrell's "participations," which were undisclosed to investors un-

der the Secured 10% Earnings Program, are suitable examples of the manner in which funds entrusted to LATD have been used by David Farrell, the principal individual defendant in this litigation.

B. Cimarron Meadows

1. By an instrument dated November 17, 1958, George C. Goheen entered into an agreement with David Farrell, by the terms of which George C. Goheen, as owner of certain unimproved real estate situated near Atwater, Merced County, California, and holder of an option to purchase additional adjoining acreage, which he had commenced to subdivide for residential purposes by filing a subdivision map covering "Atwater Village, Subdivision No. 1," agreed to continue the subdivision as a joint venture with David Farrell under the firm name of "Atwater Village," with successive units to be developed for single or multiple residential or commercial uses. By the terms of the agreement, with the exception of certain lots, George C. Goheen conveyed to the joint venture all his right, title and interest in the land to be subdivided, together with the option, and David Farrell agreed to "lend his best efforts" to arranging the sale of 32 purchase money trust deed notes, each in the principal amount of $1,600, "having an aggregate value of $41,200 [sic $51,200]," nine trust deed notes secured by nine lots zoned for multiple dwellings, each note in the principal amount of $2,100, "having an aggregate value of $18,900," 24 notes secured by 24 commercial lots, each in the principal amount of $3,498.31, "having an aggregate value of $83,959.-44," and one trust deed note in the principal amount of $10,000, secured by a specified commercial lot. By the terms of the joint venture agreement, the several trust deed notes were "to have an aggregate value of $164,005 [sic $164,-059]," each note was to bear interest at 10% per annum, with monthly installments on account of both principal and interest to be paid in a sum equaling .009% of the face amount of the note, with all accrued interest and principal to be due and payable two years from date, and with each note to be secured by a purchase money deed of trust to be subordinated upon demand to "construction or take out financing," extended by a conventional lending institution, in an amount not less than three times the principal amount due on the note to be so subordinated.

2. By the terms of the joint venture agreement, David Farrell agreed to lend his best efforts to arrange the sale of the trust deed notes at a discount not to exceed 20%, for an aggregate amount of $114,842, with the discount to include prepayment of the first year's interest on the notes, and with the net cash sum remaining available to the joint venture to be used to meet required installments on the purchase price of the land, and as the joint venturers might otherwise agree, with the balance of the funds to be retained on deposit by David Farrell or the purchaser of the trust deeds, "for the benefit of the venture" to cover "engineering services, subdivision improvements or the release of additional lots" in the best interest of the joint venture. By the terms of the joint venture agreement, monthly installments due on the trust deed notes during the second year were to be paid out of funds remaining on deposit or deducted by the purchaser of the notes, without voucher until the deposited funds were exhausted, with further payments to be shared equally by the joint venturers.

3. By the terms of the joint venture agreement, David Farrell was not required to "make any direct financial capital contribution, but [to] act as consultant to the venture in regard to all * * initial and secondary financing, and in regard to ultimate liquidation of the venture's trust deed equities * * *," and, in addition to the specific financing described in the agreement, to "exert his best efforts to .obtain similar financing * * * desirable or necessary to carrying out and consummating" the joint venture. By the terms of the agreement,

the joint venturers were to share equally in the profits and losses of the venture.

4. On January 19, 1959, Goheen Construction Co. acquired from Cimarron Cattle Co. 200 acres of land situated near Lemoore, Kings County, California, known as the Cimarron Meadows Tract, for a consideration of $200,000. An arrangement was then made under which the 200 acres of land were sold by Goheen Construction Co. to George C. Goheen for the sum of $630,768. Pursuant to this arrangement, George C. Goheen executed 800 identical promissory notes, each secured by a trust deed covering an area of approximately ¼ acre within the 200 acres, with each such note in the principal amount of $788.46, bearing interest at 10%.

5. Goheen Construction Co. at the same time entered into a "holding agreement" for an option to purchase 410 acres of land adjoining the 200 acres, to be conveyed to George C. Goheen in consideration of the 800 trust deed notes aggregating $630,768.

6. The "holding agreement," also dated January 14, 1959, which was executed by Merced County Title Company, George C. Goheen and David Farrell, recited the conveyance of the 410 acres of land to the Title Company under an agreement by which upon the joint order of George C. Goheen and David Farrell, or their nominee, the Title Company would convey all or any portion of the 410 acres of land and execute all documents necessary to enable the recordation of a final subdivision map, provided instructions for conveyancing were accompanied by a trust deed note or notes in principal amounts equal to $2,500 per acre of the acreage to be subdivided, said notes to be payable, without interest, on January 14, 1961, and to contain a provision for their *subordination* to trust deed notes given to secure on-site and off-site improvement, development or construction financing, not in excess of $500,000 for each 100 acres, or *pro tanto* lesser amounts, and with provision for

partial reconveyance or imposition of "take-out" loans on individual lots.

7. By an addendum dated January 15, 1959, to the joint venture agreement, George C. Goheen and David Farrell agreed that the 610 acres of land situated in Kings County, California, including the 200 acres sold to Goheen Construction Co. for $200,000, and contemporaneously acquired by George C. Goheen from Goheen Construction Co., in consideration of the 800 trust deed notes aggregating $630,758, should be encompassed within the joint venture, that the 200 acres should be purchased immediately for cash at $2,000 per acre (an aggregate of $400,000), but that the 200 acres should be encumbered by 800 trust deed notes, each in the amount of $788.46, to be dated January 14, 1959, bearing interest at 10% per annum, payable in monthly installments of $7.10, to commence on February 14, 1959, to mature two years from date. The 200 acres of land were to be so encumbered by George C. Goheen and acquired subject to such encumbrances for the benefit of the joint venture. The addendum to the joint venture agreement provided that from the cash proceeds of the sale of the 800 trust deed notes, a sum sufficient to service the interest requirements and amortization of principal for one year should be retained by the purchaser of the trust deed notes. With respect to the remaining 410 acres of land, the addendum contained provisions consistent with the "holding agreement." As to the 610 acres of land, the addendum modified the joint venture agreement by providing for the sharing of subdivision profits equally among George C. Goheen, David Farrell and another individual.

8. George C. Goheen executed 800 identical installment notes, in favor of Goheen Construction Co., dated January 14, 1959, each in the principal sum of $788.46, bearing interest at 10% per annum, with principal and interest payable in monthly installments of $7.10, beginning February 14, 1959, and continuing until January 14, 1961, when the entire

remaining balance becomes due and payable. The maker of the notes also executed 800 trust deeds, identical except as to the legal description of the one-quarter acre of land covered by each such trust deed, with each such unit securing one of the 800 notes. Each of the trust deeds contains a subordination clause, and covers a unit of land one-quarter acre in area with the 800 units comprising a single contiguous tract of 200 acres. Accordingly, when, and if, the 200 acres are subdivided for residential or commercial use, certain of the one-quarter acre units necessarily will be dedicated for use as streets, alleys and other public uses rather than reserved as construction sites.

9. By an instrument dated January 20, 1959, Goheen Construction Co. assigned the 800 trust deed notes to LATD. LATD then issued confirmations of the sale of the 800 trust deed notes, numbered serially from No. 802 to No. 1601, to investors under the Secured 10% Earnings Program.

10. LATD paid · $410,000 in cash which had been entrusted to it by its investors for the 800 trust deed notes covering a total of 200 acres of land which had been sold contemporaneously in fee simple to Goheen Construction Co. for $200,000. LATD also obligated itself to hold the additional sum of $63,076 to service interest requirements on the 800 trust deed notes. LATD introduced the 800 trust deed notes into accounts of investors under the Secured 10% Earnings Program for $630,768, representing a gross mark-up over cost of $157,692, and a gross mark-up over the contemporaneous cost of the land securing the trust deed notes of $430,768.

11. The investors under the Secured 10% Earnings Program to whom the 800 trust deed notes were confirmed were not informed by LATD that the trust deeds are subject to subordination to construction loans and are in effect second trust deeds. On the contrary, the trust deeds were identified on the confirmations sent to investors as FIRST TRUST DEEDS. There was no economic justification for encumbrances totaling $630,768 represented by the 800 trust deed notes. The total value of the 200 acres of land did not exceed the cost of $200,000, or $250 per one-quarter acre, to Goheen Construction Co.

12. At the time the 800 trust deed notes were confirmed to investors under the Secured 10% Earnings Program, no subdivision map or notice of intention to subdivide had been filed with the California Commissioner of Real Estate. The 200 acres of land were then and have remained entirely undeveloped. There was and could be no correspondence whatever between any subdivision map and the 800 rectangular units of land into which the 200 acres was divided in creating the 800 trust deeds (Tr. pp. 1722–1727 PX 94, 95). There is appended hereto an area map (PX 94) showing the manner in which the 800 trust deeds were created against 800 identical one-quarter acre rectangular units of land.

13. The foregoing example of the creation and purchase by LATD of the 800 trust deed notes executed by George C. Goheen, in connection with a speculative real estate subdivision in which David Farrell, President of LATD, became a joint venturer, is a good illustration of the use of funds entrusted to LATD in the course of this litigation under the Secured 10% Earnings Program in financing similar speculative joint ventures and partnerships for the benefit of David Farrell.

14. The defendants have introduced, and the Court has allowed in evidence, examples of comparable situations, involving the use of depositors' funds by officers and directors of certain companies engaged in the savings and loan business to finance acquisitions and contracts in which such officers and directors had an interest or "participation." The defendants apparently contend that such "participations" by insiders, having a fiduciary obligation to depositors, in some manner excuses or condones the conduct of the defendant David Farrell as being

within the permissive limits of the prevailing mores of the financial community. The Court rejects this evidence, involving as it does entirely irrelevant and extraneous situations, without, in the slightest degree, countenancing or condoning the practices brought into question.

15. It should be noted, parenthetically, that the existence and exact nature of the "participations" in these situations were elaborately disclosed in registration statements filed with the SEC under the Securities Act. David Farrell admitted, in the course of his testimony, that his "participations" in the numerous real estate speculations involving the creation of trust deed notes, which were acquired by LATD and introduced into the accounts of thousands of investors, have been concealed from investors under the Secured 10% Earnings Program. Indeed, the evidence establishes that his "participations" were also concealed from LATD's other directors and executive employees.

16. The record in this case establishes beyond question that the individual defendants (all of whom seem to be completely dominated by the defendant David Farrell), and, vicariously, the several corporate defendants, are entirely oblivious to any concept of the fiduciary standards under which those who are entrusted with investment funds must shape their actions in order to safeguard the interest of investors whom they have led to rely upon their representations and commitments. If not so oblivious to clearly defined and well understood principles governing the conduct of fiduciaries, they have evidenced an absolute indifference thereto, which cannot be disregarded in evaluating the Secured 10% Earnings Program as presented to the investing public.

## XIII

## THE INSTRUMENTS AS SECURITIES

1. The instruments issued and sold in connection with the Secured 10% Earnings Program are securities in at least three senses. *First,* the note secured by a deed of trust which is delivered to the investor is, as a note and evidence of indebtedness, a security expressly defined in Section 2(1) of the Securities Act, 15 U.S.C.A. § 77b(1), and Section 3(a) (10) of the Exchange Act, 15 U.S.C.A. § 78c(a) (10). As the Court of Appeals stated in 264 F.2d 199, 211:

"Irrespective of what a purchase price note secured by a second trust deed may be under California law (Brown v. Jensen, 1953, 41 Cal.2d 193, 259 P.2d 425), the view taken by the Supreme Court in Securities. and Exchange Commission v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 64 S.Ct. 120, 123, 88 L.Ed. 88, as to 'the dominating general purpose' of § 2(1) of the Act (15 U.S. C.A. § 77(b) (1) [§ 77b(1)]), and its 'generally expressly legislative policy' * * *."

means that federal and not state law is controlling in classifying the instruments as securities.[21]

21. The defendants contend that the notes secured by the trust deeds which LATD introduces into the accounts of investors, *under California law,* represent "purchase money obligations" and, therefore, are not enforceable against the makers or trustors, except to the extent of the underlying equities in the units of land covered thereby. They then assert that, as the obligors are not subject to personal liability on the notes, the instruments are not "notes" at all and are not "evidences of indebtedness," within the statutory definition. Cf. Llanos v. United States, 9 Cir., 206 F.2d 852, certiorari denied 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417, where a number of unsecured notes, most of them payable by "mutual agreement," were held to be "evidences of indebtedness" within Section 2(1) of the Securities Act, 15 U.S. C.A. § 77b(1), and a conviction for fraud was affirmed. Leaving aside the serious question posed by the record, whether, in the circumstances under which they have been created, thousands of the trust deed notes truly represent "purchase money obligations" rather than instru-

As the Supreme Court stated in S. E. C. v. Variable Annuity Life Insurance Co. of America, 1959, 359 U.S. 65, 69, 79 S.Ct. 618, 621, 3 L.Ed.2d 640:

"In any event how the States may have ruled is not decisive. For, as we have said, the meaning of 'insurance' or 'annuity' under these Federal Acts is a federal question."

*Second*, the receipt issued by defendants evidencing the deposit of the investor's funds with LATD, pending selection by defendants of a note and deed of trust for the investor, is also a security by definition. *Third*, the instruments issued in connection with the Secured 10% Earnings Program, accompanied as they are by the defendants' services of collection, screening, processing, repurchasing or reselling, in accordance with the general plan of investment in the light of the representations, express and implied, made by the defendants, are investment contracts within the statutory definition.

2. It is entirely clear from the evidence, and the Court finds, that investors who commit their funds under the Secured 10% Earnings Program are investors in a "common enterprise", whose economic welfare is inextricably interwoven with the ability of LATD to meet its commitments, and the value of whose accounts is dependent upon the solvency and resources of LATD. The Court finds that investors under the Secured 10% Earnings Program are "led to expect" the promised 10% earnings solely on the basis of the continued ability of LATD to select, screen, appraise and acquire

suitable trust deed notes, to service and collect the loan and, if necessary, handle foreclosure thereof, and if required by the investor, to repurchase or arrange for the resale of the obligation. There is an implied guarantee against loss and that investors will realize a minimum of "10% earnings," and a definite commitment by the defendants to arrange for continuous reinvestment of the investor's funds, so that such earnings will be compounded monthly for an indefinite length of time.

3. It is evident that few of the investors, many of whom reside at great distances from the State of California, where the makers of the notes reside and where appraisals, collections and foreclosure proceedings must be carried out, have any knowledge of or, indeed, any interest in the solvency of the makers of the notes or the quality of the underlying security.

4. The evidence establishes that investors under the Secured 10% Earnings Program, in a very real sense, are at the complete mercy of LATD, that LATD possesses almost complete dominion and control over their accounts, and that at times LATD has used its strategic position to manipulate the accounts of investors to its own advantage and to the disadvantage of the investors. This element alone, in the opinion of the Court, would be sufficient to justify classification of the instruments issued under the Secured 10% Earnings Program as investment contracts. Such finding, however, is not necessary as, measured by any standard, the Secured 10% Earnings

---

ments designed to evade applicable state usury laws, their classification under California law is not decisive. As Mr. Justice Jackson said in S. E. C. v. M. C. Joiner Leasing Corporation, 1943, 320 U.S. 344, 352, 64 S.Ct. 124:

"Nor can we agree with the court below that defendants' offerings were beyond the scope of the Act because they offered leases and assignments which under Texas law conveyed interests in real estate. In applying acts of this general purpose, the Courts have not been guided by the nature of the assets back of a particular document or

*offering*. The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect * *."

The trust deed notes are described in the defendants' offering brochures (except the most current one) as "negotiable notes." The brochures refer to the careful investigation which the defendants make of the credit standing of the makers of the notes. There is no disclosure that the obligors are immune from personal liability.

Program involves the sale of investment contracts within the principles announced by the Supreme Court in S. E. C. v. C. M. Joiner Leasing Corporation, 1943, 320 U.S. 344, 64 S.Ct. 120, and S. E. C. v. W. J. Howey Co., 1946, 328 U.S. 293, 298, 299, 66 S.Ct. 1100.

5. The community of interest which exists among investors under the Secured 10% Earnings Program is made explicit by the fact that, in accordance with the arrangements between LATD and real estate subdividers under which thousands of trust deed notes are created, brought into inventory by LATD, and introduced into the accounts of investors, LATD regularly withholds from the purchase price of the trust deed notes substantial sums of money to cover "scheduled improvements" and to service interest requirements on the obligations for stated periods of time. For example, as at September 25, 1959, LATD's balance sheet shows that $2,229,811 had been so withheld by LATD from the purchase price of trust deeds theretofore brought into inventory and introduced into the accounts of investors. The record shows (Tr. pp. 2134, 2142) that pursuant to an agreement between Villa Nipomo, Inc. and LATD dated September 16, 1959, 2139 trust deeds divided into five groups, aggregating $1,982,075 in face amount, were acquired by LATD at a total cost of $1,585,660, of which LATD withheld $760,660 to cover anticipated off-site improvements and to service interest requirements.

6. There can be no question but that, through these and similar arrangements, LATD creates a condition under which the economic welfare of investors is dependent upon the financial resources of LATD and its ability to meet obligations which are assumed in connection with the creation of trust deeds sold to investors; and that any default by LATD would seriously jeopardize and impair the value of the securities sold to investors in connection with any situation where LATD has withheld or is now withholding funds to be applied to "scheduled improve-

ments", or to service interest requirements or amortization of principal for stated periods of time.

7. The Court of Appeals suggested that a determination of the basic issues involved in this litigation requires a factual determination "whether there was an investment 'in a common enterprise,' and whether the purchaser 'is led to expect profits solely from the efforts of the promoter or a third party.'" [264 F.2d 212] S. E. C. v. W. J. Howey Co., (1946), 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1102, 1103, with consideration being given to "the various other elements which cause or bar the recognition of a document, plan, course of dealing, or program, as a security—all factors leading to an ultimate conclusion as to whether or not that which is here sold is subject to the Act". The Court makes that finding. The elements that make up an "investment contract" within the statutory definition, as distinguished from some other form of security, are not amenable to characterization in absolute terms. Consideration must be given to all surrounding and collateral arrangements. Measured by the standards enunciated in S. E. C. v. C. M. Joiner Leasing Corp. and S. E. C. v. W. J. Howey Co., the Court finds *categorically* that the instruments offered by the defendants are "investment contracts." The "thread on which [the investors] beads are strung", S. E. C. v. C. M. Joiner Leasing Corporation, 320 U.S. 348, 64 S.Ct. 122, is the ability of the defendants to make good their representations, commitments and undertakings to investors under the Secured 10% Earnings Program, specifically, if called upon, to accomplish the liquidation of the accounts of 8000 investors at the fictitious "liquidation values" which the defendants represent to exist.

## XIV

## ADDITIONAL FINDINGS AND CONCLUSIONS

■ 1. The Court notes that under Section 20(b) of the Securities Act, 15 U.S.C.A. § 77t(b), and Section 21(e)

of the Exchange Act, 15 U.S.C.A. § 78u(e), the SEC alone is authorized to bring actions such as this to enjoin violations of those statutes. Neither statute contemplates that, in proceedings such as this, the SEC should join as a litigant with investors who may have been defrauded or who are otherwise dissatisfied. Such investors have available other civil remedies under the two statutes. Moreover, the fact that, in an effort to shorten and keep the trial record within reasonable dimensions, counsel for the SEC called only two "investor witnesses" is of no consequence. From the outset of the trial, counsel for the SEC made it clear that the case for the SEC would be constructed primarily from the internal records of the corporate defendants (including documentary evidence of the defendants' deceitful course of dealing with investors), and from the testimony of the individual defendants and executive employees of the corporate defendants, whom the SEC called as adverse witnesses.

2. This course of action was followed. Indeed, no other course was open to the SEC, notwithstanding the formidable barriers interposed by the defendants in refusing access to essential records, including those necessary to establish the financial condition of LATD, which were encompassed within a pre-trial order of the Court under Rule 34 of the Federal Rules of Civil Procedure.

3. It was not until the trial was begun that the SEC, through *subpoenas duces tecum,* was enabled to dredge the necessary evidence from the defendants' records, evidence which the defendants, if acting in good faith and in compliance with the discovery order under Rule 34, would have made available long before. The net effect of defendants' recalcitrance was to obstruct and impede orderly trial processes, to unnecessarily consume the time of both the Court and the SEC, and to create unwarranted, burdensome, and entirely unnecessary problems for the SEC in sustaining, as it did by irrefutable evidence, the burden of proof

on the complex issues involved in this litigation.

4. It is admitted that the securities issued under the Secured 10% Earnings Program have not been registered with the SEC under the Securities Act, and that neither LATD, TD&ME nor TD&MM is registered as a broker or dealer in securities under the Exchange Act.

5. The foregoing findings necessarily require the corollary finding that LATD, TD&ME and TD&MM are brokers and dealers in securities as defined in Sections 3(a) (4) and (5) of the Exchange Act, 15 U.S.C.A. § 78c(a) (4) and (5).

6. The Court notes that, although near the end of SEC's case, counsel for the defendants indicated that the defense would consume about three trial weeks, except for recalling David Farrell and Stanley C. Marks for brief testimony, and the equally brief testimony of Edwin Russ, a certified public accountant, *the defendants offered no defense.* The Court rejects the testimony of Mr. Russ, but in doing so notes that he was called upon by the defendants to testify in an area in which he admittedly had no special competence, and that the record shows that, for some incomprehensible reason, information of vital bearing upon his testimony was withheld from him (Tr. pp. 3242–3286). The Court believes that, had the true facts been made available, Mr. Russ would not have consented to appear as a witness.

7. The Court also notes that for reasons which are manifest from the record the defendants chose not to bring forward as an expert witness Robert F. Jordan, the certified public accountant, who certified the "window-dressed" financial statements of LATD as at June 1, 1959 (PX 11), and September 25, 1959 (PX 42), or that, perhaps, Mr. Jordan declined to appear.

8. The accuracy and authenticity of the elaborate schedules (PX 77, 96, 97, 98, 99, 100, 160, 166) which the SEC compiled from the records of LATD and

**890**

other sources, and which underlie the findings of the Court, stand entirely unchallenged.

## XV

## NECESSITY FOR THE APPOINTMENT OF A RECEIVER

1. This Court, as a Court of equity, having jurisdiction under Section 22(a) of the Securities Act, 15 U.S.C.A. 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.A. 78aa, may mold its decree to meet the exigencies of the situation before it and, as the Court of Appeals stated 264 F.2d 199, 211, order liquidation even "of a solvent corporation where there is no other course available to remedy a situation that needs solution. Riehle v. Margolies, 1929, 279 U.S. 218, 49 S.Ct. 310, 73 L.Ed. 669. And see Hornstein, A Remedy for Corporate Abuse, 40 Colum.L.Rev. 220, 224 (1940). * * *" On the basis of the entire record on the trial on the merits, the Court finds that such a situation exists. The Court finds that the defendants knowingly have committed a series of indefensible breaches of trust in their administration of the Secured 10% Earnings Program, and that they are oblivious to the standards of conduct which applicable statutes and commercial honor demand.

2. The Court, while recognizing that the appointment of a receiver for a financial institution is a measure to be adopted only in the most compelling circumstances, and where no other reasonable course is open, on the basis of the foregoing findings, and the further finding that the defendants in this action have engaged in widespread and willful violations of the Securities Act and the Exchange Act, that there is no reasonable likelihood that they will discontinue such violations, even under a decree of injunction, and the further specific finding that as at March 31, 1959, the defendant LATD was insolvent, in a bankruptcy sense, and that only through the interposition of a receiver will it be feasible, or indeed possible, to determine and adjust the equities of the thousands of investors whose savings have been entrusted to LATD, which are now seriously endangered, finds that it is imperative that a receiver be appointed with instructions to secure an immediate accounting of the assets and liabilities of LATD and to proceed with an orderly liquidation.

3. The Court also finds that the receivership must also extend to TD&MM, which the evidence shows is a mere department of LATD. At this time, although the evidence shows that the only source of revenue to TD&ME is a siphoning off of 10% of the gross profits which LATD realizes through continuous defrauding of members of the investing public, the Court will not accede to the request of the SEC for the appointment of a receiver for TD&ME, but reserves jurisdiction to do so in the event the report of the receiver indicates that such a course is necessary and desirable in the circumstances.

## XVI

## CONCLUSION

The Court finds and concludes that all of the allegations of Counts I, II, III, IV and V of the Amended and Supplemental Complaint are fully sustained by the evidence, that a permanent injunction should be entered in accordance with the demands made by the Securities and Exchange Commission, and that a receiver for Los Angeles Trust Deed & Mortgage Exchange and Trust Deed & Mortgage Markets should be appointed forthwith.